Argued and submitted January 15, reversed and remanded April 29, petition for review denied July 14, 1998 (327 Or 431)

Eileen WILLIAMS,
*Appellant,*

*v.*

TRI-COUNTY METROPOLITAN TRANSPORTATION
DISTRICT OF OREGON,
an Oregon municipal corporation,
*Respondent.*

(9509-06328; CA A95145)

958 P2d 202

Gregory Kafoury argued the cause and filed the briefs for appellant.

Janet M. Schroer argued the cause for respondent. With her on the brief were S. Kenji Kozuma and Hoffman, Hart & Wagner.

Before De Muniz, Presiding Judge, Deits, Chief Judge,* and Linder, Judge.

LINDER, J.

_____

* Deits, C. J., *vice* Leeson, J., resigned.

## LINDER, J.

In this appeal, we must decide whether plaintiff has stated a claim against defendant Tri-Met for intentional infliction of emotional distress (IIED). The trial court entered judgment on the pleadings in favor of defendant, pursuant to ORCP 21 B; plaintiff appeals. In reviewing the trial court's ruling, we accept as true all facts alleged in the complaint and all reasonable inferences that can be drawn from those facts. *Slogowski v. Lyness*, 324 Or 436, 439, 927 P2d 587 (1996); *Huang v. Claussen*, 147 Or App 330, 332, 936 P2d 394, *rev den* 325 Or 438 (1997). We hold that the complaint states a claim for IIED and, accordingly, we reverse.

This case arises out of the manner in which plaintiff, who is physically disabled, allegedly was treated by a bus driver after she and her assistance dog boarded a Tri-Met bus. Plaintiff alleged that after boarding the bus, the following occurred:

"[A]s plaintiff sought access to the seating area of the bus, the Tri-Met driver * * * berated, insulted, and belittled the plaintiff in the presence of other passengers by loudly questioning her right to bring an assistance dog onto the bus. After refusing to examine paperwork offered by plaintiff to show that the dog's presence on the bus was lawful, the driver wrongly insisted that the assistance dog must have a photo identification card before it would be permitted to accompany the plaintiff on a Tri-Met bus in the future. The driver also asked the plaintiff why she needed [an] assistance dog and said that she didn't look disabled to him, and said that rather than being disabled, she was simply trying to pay a reduced fee by using a disabled citizen's card. The driver then ordered the plaintiff to sit down. At all times, the assistance dog was fully under plaintiff's control. Additionally, after the plaintiff indicated that the bus was approaching her destination, the driver ordered the plaintiff to get off of the bus and told the plaintiff not to try to reboard any transit vehicle which he was driving. [The driver] also loudly proclaimed that he did not have to have any stupid dog on the bus if he did not want it to be there."

Plaintiff further alleged that at all times the driver was acting within the course and scope of his employment; that the driver's conduct was "socially intolerable"; that the driver

acted with an intent to cause severe emotional distress or with reckless disregard that severe emotional distress was likely to result; and that plaintiff "did in fact suffer, continues to suffer, and will permanently suffer from severe emotional distress in the form of fear, anguish, depression, anxiety, and humiliation."

This appeal turns on whether a jury reasonably could find that defendant's conduct, as pleaded, constitutes an "extraordinary transgression" of socially tolerable conduct. The trial court concluded that the allegations of the complaint did not meet that standard; the court therefore granted judgment on the pleadings for defendant. Plaintiff challenges that ruling, arguing that a jury could find that defendant's conduct exceeded the range of what is "socially tolerable" based on two factors: (1) plaintiff's status as a person with a physical disability, and (2) defendant's relationship to plaintiff as a provider of public transportation. In response, defendant contends that, although the bus driver's conduct undoubtedly qualifies as rude and offensive behavior, as a matter of law, it falls short of what reasonably can be deemed "socially intolerable conduct."

■     To state an IIED claim, a plaintiff must plead that

"(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty v. Staudenraus*, 321 Or 532, 543, 901 P2d 841 (1995) (quotation marks omitted; citing *Sheets v. Knight*, 308 Or 220, 236, 779 P2d 1000 (1989)).

■■     Whether particular conduct rises to the necessary level of social intolerability is, for the most part, a fact-specific inquiry that requires a case-by-case examination of the circumstances as a whole. *Rockhill v. Pollard*, 259 Or 54, 60, 485 P2d 28 (1971); *Lathrope-Olson v. Dept. of Transportation*, 128 Or App 405, 408, 876 P2d 345 (1994). The circumstances to be examined encompass not only the specific conduct in question, but also the relationship between the parties. *McGanty*, 321 Or at 548. That is, a defendant's position or role *vis-a-vis* a plaintiff may be one that "imposes on

the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters among strangers." *Id.* at 547-48 (quotation marks omitted).[1] Therefore, in this case, we examine not just the bus driver's conduct, but also how the relationship between a provider of public transportation and a disabled passenger bears on the norms of socially appropriate conduct.

■ The crux of the issue here is whether the bus driver's behavior, as alleged in the complaint, could be considered, at most, commonplace "friction and rudeness among people in day-to-day life," *Hetfeld v. Bostwick*, 136 Or App 305, 308, 901 P2d 986, *rev den* 322 Or 360 (1995), or whether a jury reasonably could find it offensive in some extraordinary way. As the *Restatement* observes:

> "The liability [for intentional infliction of extreme emotional distress] * * * does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's [*sic*] feelings are hurt." *Restatement (Second) of Torts*, § 46 at 73 (1965).

Thus, the essential distinction is between offensive and even emotionally hurtful behavior that is a normal incident of daily life and behavior that goes beyond the bounds of what society would say reasonably must be endured.

As alleged, the specific comments made by the bus driver to plaintiff could be considered harassment directed to plaintiff specifically in connection with her disabled status. In that respect, the bus driver's conduct is closely analogous to conduct in *Lathrope-Olson* that we held sufficient to state a claim for IIED. The plaintiff in that case was a female

---

[1] In *McGanty*, the Supreme Court quoted that language from *Hall v. The May Dept. Stores*, 292 Or 131, 637 P2d 126 (1981), with approval for the proposition that the parties' relationship bears on the offensiveness of the conduct. The court disapproved of *Hall* insofar as it held that the relationship between the parties also bears on the level of intent required. *McGanty*, 321 Or at 548.

employee who was part Native American. Her male supervisor and other male employees regularly referred to her as "squaw," repeatedly subjected her to sexually harassing comments, and jeopardized her physical safety in various ways. We held that "[s]uch overt acts of racism and sexual harassment are not simply rude and boorish, but are more properly characterized as the kind of conduct that a jury could find was intended to inflict deep, stigmatizing and psychic wounds on another person." *Lathrope-Olson*, 128 Or App at 408.

Similarly, *Whelan v. Albertson's, Inc.*, 129 Or App 501, 879 P2d 888 (1994), involved not common rudeness or petty indignities, but conduct with the potential to be specially stigmatizing and injurious. There, a supervisor and another employee repeatedly called a fellow worker, whom they believed to be gay, a "queer" and made other similarly derogatory verbal assaults on him in front of coemployees and customers. We observed that the insults directed at the plaintiff were sexual in nature and resembled the socially intolerable sexual references at issue in *Lathrope-Olson*. *Whelan*, 129 Or App at 505. We noted that such conduct might not be actionable "in isolation," but we were satisfied that it became so when the taunts and harassment were made publicly, in the presence of customers and other workers. *Id.* at 505-06.

The common thread running through *Lathrope-Olson* and *Whelan* is the recognition that, depending on the circumstances, insults or harassment directed to individuals on the basis of historically disfavored personal characteristics more readily transgress contemporary social bounds than do other forms of antagonistic behavior. That same recognition is reflected in the variety of public accommodation and anti-discrimination laws enacted in Oregon and other states. So-called "hate crimes" laws, for example, provide for aggravated penalties for certain forms of bias-motivated conduct in acknowledgment that such conduct inflicts "distinct emotional harms on their victims" that are not inflicted when the same conduct is not bias-motivated. *See generally Wisconsin v. Mitchell*, 508 US 476, 488, 113 S Ct 2194, 124 L Ed 2d 436 (1993) (discussing government's compelling interest

in such laws); ORS 166.165 (Oregon's prohibition on bias-motivated intimidation). Likewise, public accommodation laws protect certain historically disadvantaged groups from discrimination in publicly offered services, in tacit recognition that the denial of generally available goods and services based on such bias, rather than more benign motivations, uniquely injures and stigmatizes members of the targeted group. *See generally Roberts v. United States Jaycees*, 468 US 609, 625-28, 104 S Ct 3244, 82 L Ed 2d 462 (1984). *Accord Lloyd Lions Club v. Int. Assoc. of Lions Clubs*, 81 Or App 151, 155-57, 724 P2d 887 (1986), *rev dismissed* 303 Or 698 (1987).

Laws specially protecting disabled persons from bias-motivated discrimination and harassment have been in place in Oregon for more than two decades. *See generally Bush v. Greyhound Lines, Inc.*, 295 Or 619, 669 P2d 324 (1983) (describing history of civil rights laws protecting disabled persons). Oregon's overarching policy is to "guarantee disabled persons the fullest possible participation in the social and economic life of the state." ORS 659.405(1). Over time, Oregon's statutes gradually have expanded to prohibit disabled persons from differential treatment in a host of contexts, including places of public accommodation, employment in public and private sectors, private housing, and access to commercial and governmental facilities, to identify but a few.[2] Protection for disabled persons exists at a national level as well. *See* Americans With Disabilities Act (ADA), 42 USC § 12101 *et seq*. That extensive legal framework amply reflects our social sensitivity to the distinct injuries that accrue from attitudes and behavior that single out disabled persons. Thus, just as race-based or sex-based insults may be socially intolerable in a way that insults directed to undifferentiated members of the public may not, so too is disability-based

---

[2] *See, e.g.*, ORS 44.547 (courts shall specially accommodate witnesses with disabilities); ORS 192.630 (government meetings must be held in places that do not discriminate against persons with disabilities); ORS 240.630 (state employees shall be hired without regard to disabilities); ORS 447.210 *et seq*. (policy of ensuring equal physical access to commercial facilities, public accommodations, private entities, churches, and private membership clubs for persons with disabilities); ORS 659.020 (declaration of state policy against discrimination on basis of disability); ORS 659.100 (prohibiting private employment discrimination on the basis of disability); ORS 659.425 (unlawful for place of public accommodation to make any "distinction, discrimination or restriction" based on disability); ORS 659.430 (protection from housing discrimination on basis of disability).

harassment different in kind, and potentially offensive in the extreme.[3]

■ Giving plaintiff the benefit not only of the facts alleged, but also of the reasonable inferences to be drawn from those facts, we conclude that the complaint states a claim. Fundamental to our conclusion is plaintiff's disabled status. By challenging plaintiff as he allegedly did, the driver could be perceived as drawing attention to plaintiff's status while also ridiculing her for not being disabled "enough" to justify a reduced fare and accommodation for her special needs. As pleaded in the complaint, the driver's conduct could be considered harassment of a kind that historically has been directed to disabled individuals in an effort to ostracize and humiliate them.

Equally fundamental to our holding is the driver's relationship to plaintiff. As a provider of public transportation, the relationship is a special one within our society, as evidenced by the extensive fabric of laws that seek to secure full and effective access to publicly available goods and services for disabled persons. *See Bush*, 295 Or at 621-22 (court construed statutory scheme to provide discrimination action to wheelchair-bound person who was denied transport on bus, where legislative policy of nondiscrimination was evident and repeal of remedy was obviously inadvertent). Also important is the public nature of the driver's conduct, which could be found to aggravate the offensiveness of what occurred by potentially drawing unnecessary and unwanted attention to plaintiff's circumstances and disability. The combination of those factors—harassing treatment based on plaintiff's disabled status, the driver's special relationship to her as a provider of public transportation, and the public setting—is such that the alleged conduct crosses the threshold of potential liability.[4]

---

[3] Although this case does not involve actual slurs, the observations that courts and academic writers have made about the uniquely injurious force of such words apply equally to the kind of disability-based harassment involved here. *See, e.g.*, Richard Delgado, *Words that Wound: A Tort Action for Racial Insults, Epithets, and Name-Calling*, 17 Harv Civ Rts-Civ Lib L Rev 133, 157 (1982) ("Racial insults are different qualitatively because they conjure up the entire history of racial discrimination in this country."); *Karins v. City of Atlantic City*, 152 NJ 532, 702 A2d 706 (1998) (certain words, in the context of history, carry added meaning).

[4] Defendant, somewhat briefly, argues that no consideration should be given to the relationship between the driver, as a provider of public transportation, and

■ We reject defendant's contention that because the encounter between plaintiff and the driver occurred one time only, the insults legally cannot constitute an extraordinary transgression of socially tolerable conduct. The repeated nature of harassing behavior directed to a plaintiff certainly bears on whether conduct is outrageous or extreme, *see Lathrope-Olson*, 128 Or App at 407, but it is not controlling. The circumstances of each case must be examined in their entirety. Here, our conclusion might be different if plaintiff had been harassed or intimidated in the same way on a single occasion by a fellow passenger while the two waited alone for the bus to arrive. This case is qualitatively different, however, given the bus driver's status as someone who could withhold or burden plaintiff's access to public transportation, his threat to do so in the future, and the presence of other passengers at the time of the encounter. *See Taylor v. Metzger*, 152 NJ 490, 706 A2d 685, 695-96 (1998) (single racial slur held adequate to support a claim for IIED given specially injurious nature of racial insults, coupled with fact that the slur was made by the plaintiff's supervisor who was the chief executive of the office and who occupied a position of particular power and authority). Under the particular circumstances of this case, plaintiff's claim is not defeated as a matter of law by the fact that the alleged harassment occurred on only one occasion. *See Rockhill*, 259 Or at 59 (claim of IIED actionable based on single encounter between doctor and accident victim and her infant child).

It remains for plaintiff to come forward with satisfactory evidence that the conduct occurred as she alleges, that the driver had the requisite intent, and that the conduct caused the damages she has alleged. On that evidence, it will be for a factfinder to decide whether the driver's conduct was an "extraordinary transgression of the bounds of socially tolerable conduct," or fell below that level of offensiveness. The only question before us is whether the complaint states a

---

plaintiff, as a disabled user of that transportation, because the complaint does not allege that the driver knew that plaintiff was actually disabled. The gravamen of the complaint, defendant contends, is that the driver did not believe that plaintiff was disabled. Perhaps that is one inference to be drawn from the complaint. However, an equally reasonable inference is that the driver was belittling plaintiff based on her disability. On review, plaintiff is entitled to the more beneficial of those competing inferences.

claim for IIED sufficient to survive a motion for judgment on the pleadings. We hold that it does.

Reversed and remanded.