Argued and submitted October 25, 1999, affirmed March 13, 2002

Michael DELANEY,
individually and as Guardian Ad Litem
for Bryan Delaney, Jason Delaney and Justyn Delaney,
*Appellants,*

*v.*

Carol CLIFTON, Ph.D.
and Mary Ellen Farley, M.A.,
*Respondents.*

9609-07191; A101248

41 P3d 1099

Michael R. Shinn argued the cause and filed the briefs for appellants.

Wendy J. Paris argued the cause for respondent Carol Clifton, Ph.D. With her on the briefs were Kubik & Paris, Peter R. Chamberlain and Bodyfelt Mount Stroup & Chamberlain.

Peter R. Chamberlain argued the cause for respondent Mary Ellen Farley, M.A. With him on the briefs were Bodyfelt Mount Stroup & Chamberlain, Wendy J. Paris and Kubik & Paris.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

LINDER, J.

## LINDER, J.

This is an action for professional malpractice and for intentional infliction of emotional distress (IIED) brought against two therapists, a professional counselor and a clinical psychologist.[1] The claims were brought by the former husband of defendants' patient, Lee Ann Delaney.[2] Plaintiff alleged that defendants misdiagnosed Lee Ann with multiple personality disorder and that plaintiff suffered from severe emotional distress as a result. The trial court dismissed plaintiff's professional malpractice/negligence claims and granted summary judgment in favor of defendants on the IIED claims. Plaintiff assigns error to both rulings. Defendants cross-assign error to the trial court's failure to dismiss the IIED claims. We conclude that plaintiff failed to state a claim for professional malpractice or ordinary negligence, because the complaint failed to allege facts establishing that defendants owed a duty to protect plaintiff from emotional distress. We further conclude, on defendants' cross-assignment, that defendants were entitled to dismissal of the intentional tort claims (*i.e.*, claims for IIED). In that regard, we conclude that the allegations in the complaint were inadequate to allege conduct that is an extraordinary transgression of the bounds of socially tolerable conduct. We therefore affirm.

We begin by outlining the relevant facts as they are alleged in the complaint. Plaintiff and Lee Ann were married from 1985 to 1995 and had three children. In 1993, Lee Ann began to attend lectures and to read books about multiple personality disorder (MPD) and satanic cults. Based on her readings, she suspected that she was suffering from MPD

---

[1] Throughout our opinion, we use the term "therapist" to include both of defendants' occupations and other similar professional counseling relationships.

[2] Plaintiff's three children also brought claims for professional malpractice and for IIED against defendants in the same complaint as did plaintiff. The children's claims for IIED were dismissed voluntarily and therefore are not before us on appeal. The trial court dismissed the children's professional malpractice claims together with plaintiff's claim. For ease of reference, however, we refer to "plaintiff" in the singular throughout this opinion, with the understanding that, in our discussion of the professional malpractice claim, the term includes plaintiff's children and their claims.

and that she had been a victim of satanic ritual abuse. Plaintiff, too, became convinced of the existence of a satanic cult, of Lee Ann's and his own involvement in it, of the fact that Lee Ann was suffering from MPD, and of the validity of the treatment for the diagnosis. Later that year, Lee Ann retained the professional counseling services of defendant Mary Ellen Farley, a Catholic nun who specializes in the diagnosis, care, and treatment of mental health problems, including MPD and satanic ritual abuse. Farley used a form of treatment with Lee Ann known as "memory retrieval." During the course of that treatment, Lee Ann described "alter personalities" that surfaced in response to train whistles and telephone messages and that participated in ceremonies in which people and animals were tortured. Lee Ann also believed that she had buried her children in the backyard, that she saw angels, that her family members had ritualistic scars on their genitals, and that a cult leader planned to sacrifice her and her now-former husband, plaintiff. According to plaintiff's complaint, Farley continually assured Lee Ann that her memories were accurate.

In July of 1994, Farley referred Lee Ann to defendant Carol Clifton, a clinical psychologist who specializes in the diagnosis and treatment of dissociative disorders and satanic ritual abuse. Clifton diagnosed Lee Ann as suffering from a dissociative disorder (specifically, MPD) and began treating Lee Ann by attempting to "integrate" her alter personalities. Clifton also associated a "cult deprogrammer" to aid in Lee Ann's therapy. Clifton urged plaintiff to move out of their family home for two weeks so that the deprogrammer could more effectively "deprogram" Lee Ann by staying in the home with her. Plaintiff alleged that Lee Ann's paranoia and delusions were caused by defendant Farley's and defendant Clifton's treatment methods, which in turn strained the marriage and ultimately caused Lee Ann and plaintiff to dissolve their marriage.

Plaintiff brought professional malpractice and IIED claims against both defendants based on the foregoing allegations. In the professional malpractice claims, plaintiff alleged that the memory retrieval techniques used by defendants, as well as the MPD diagnosis itself, are considered controversial and unreliable in the mental health profession.

As a result of defendants' diagnoses and treatment of Lee Ann, plaintiff allegedly suffered "mental anguish, pain, suffering, anxiety, prolonged separation from Lee Ann, and permanent psychological damage." Plaintiff further alleged that it was "foreseeable" to defendants that their negligent treatment of Lee Ann would cause such harm. In separate claims for IIED, plaintiff realleged the above-described facts and asserted that defendants knew that their conduct was "substantially certain" to cause severe emotional distress to plaintiff.

Pursuant to ORCP 21 A(8), the trial court dismissed plaintiff's professional malpractice claim for failure to state a claim. The trial court later granted defendants' motion for summary judgment on plaintiff's IIED claims, concluding that plaintiff, as a "third-party" victim who was not present when defendants' conduct occurred, could not recover on such a theory as a matter of law. Plaintiff assigns error to both rulings, and we discuss each in turn.

■ Professional negligence, or malpractice, is the failure to meet the standard of care used in the reasonable practice of the profession in the community. *Getchell v. Mansfield*, 260 Or 174, 179, 489 P2d 953 (1971). To state a claim for professional malpractice, a plaintiff must allege that a particular duty arising from a special relationship runs from the defendant to the plaintiff, one that is distinct from the general duty not to engage in conduct that unreasonably creates a foreseeable risk of harm. *Stevens v. Bispham*, 316 Or 221, 227, 851 P2d 556 (1993); *see also Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 14-17, 734 P2d 1326 (1987) (discussing elements of negligence action in the context of a special relationship). On review of a dismissal for failure to state a claim, we accept the facts alleged in the complaint as true along with all reasonable inferences that can be drawn from the allegations. *Richer v. Poisson*, 137 Or App 157, 159-60, 903 P2d 932 (1995).

■ Plaintiff's complaint does not allege that defendants had a particular duty of care arising from a special relationship with plaintiff. Rather, it alleges only that Lee Ann sought professional counseling from defendants and that it was foreseeable to defendants that Lee Ann's relationship

with plaintiff would be and, in fact, was damaged as a result of the counseling treatment. The allegations therefore fall short of what is required for plaintiff to state a claim for professional malpractice.

■■ For related reasons, plaintiff's complaint is not sufficient to allege ordinary, common-law negligence. Here, plaintiff seeks redress for emotional injury alone. For plaintiff to have a negligence claim in that circumstance, liability for his purely psychic injury must have a legal source that goes beyond the common-law duty to exercise reasonable care to prevent foreseeable harm. *See Hammond v. Central Lane Communications Center*, 312 Or 17, 22-25, 816 P2d 593 (1991) (relying on *Norwest v. Presbyterian Intercommunity Hosp.*, 293 Or 543, 558-59, 652 P2d 318 (1982)); *see also Spiess v. Johnson*, 89 Or App 289, 748 P2d 1020, *aff'd by equally divided court* 307 Or 242, 765 P2d 811 (1988) (because the plaintiff did not have a doctor-patient relationship with the defendant psychiatrist, the plaintiff did not have a claim for negligence based on the psychiatrist's counseling and treatment of his wife). Again, plaintiff's complaint alleges only that it was "foreseeable" to defendants that their negligent treatment of Lee Ann would cause psychological harm to plaintiff, not a legal source for liability beyond the foreseeability of plaintiff's injury. Consequently, plaintiff's professional malpractice allegations also do not state a claim for negligence generally.

In arguing to the contrary, plaintiff relies on *Zavalas v. Dept. of Corrections*, 124 Or App 166, 861 P2d 1026 (1993), *rev den* 319 Or 150 (1994). In particular, he asserts that *Zavalas* stands for the proposition that a professional is liable to anyone to whom the professional unreasonably creates a foreseeable risk of harm, even in the absence of a therapist-patient relationship with the plaintiff. To be sure, the court in *Zavalas* held that professionals are not entitled to the benefit of an across-the-board "no duty" rule merely because they are not in privity with those whom their negligent conduct affects. *Id.* at 173; *see also Docken v. Ciba-Geigy*, 86 Or App 277, 739 P2d 591, *rev den* 304 Or 405 (1987) (physician's liability for failure to warn of dangers of prescription drug extends to anyone foreseeably injured by that negligence).

*Zavalas,* however, involved claims for personal *physical* injuries and did not purport to abrogate the settled case law involving purely *emotional* injuries. Because plaintiff in this case sought recovery for emotional distress alone, *Zavalas* is inapposite.

Beyond his reliance on *Zavalas,* plaintiff devotes a large portion of his brief to criticizing defendants' conduct and calling for this court to join a "national trend" of jurisdictions that, in the context of MPD generally and memory retrieval cases in particular, recognize negligence claims against therapists brought by persons outside the therapist-patient relationship. We are unconvinced that such a trend exists.[3] More to the point, however, we would have to depart from settled Oregon tort jurisprudence to join the trend, if there were one. We decline to do so. Plaintiff's complaint neither alleged a special relationship with defendants that would give rise to a claim of professional malpractice nor alleged any legal source of liability for purely emotional damages beyond foreseeability. Because of the lack of those allegations, the trial court properly dismissed plaintiff's negligence claims.

We turn to plaintiff's claim of an intentional tort—that is, his IIED claim. The trial court granted summary judgment in favor of defendants, concluding that plaintiff could not recover for IIED as a matter of law, because defendants' conduct was directed to a "third-party," not to plaintiff. In support of its ruling, the trial court relied on the *Restatement (Second) of Torts* § 46(2) (1965), which describes so-called "third party" IIED claims. Under the *Restatement,* the tort of IIED consists of directing extreme and outrageous conduct to another with an intent to cause that person severe

---

[3] For example, plaintiff quotes extensively from the opinion in *Doe v. McKay,* 286 Ill App 3d 1020, 678 NE2d 50 (1997), which the Illinois Supreme Court reversed. *See Doe v. McKay,* 183 Ill 2d 272, 700 NE2d 1018 (1998). Although defendants pointed out at trial that the intermediate appellate decision had been overturned by the state's highest court, plaintiff continues to rely on the intermediate decision, without so much as noting that it was later reversed. With regard to the scattered sampling of other authority that plaintiff cites, the cases do not appear to represent a "national trend" so much as a simple split of authority on the issue of whether "foreseeability" should be the test of a professional's liability to persons outside the professional-client relationship who suffer emotional distress due to alleged negligence in the professional services rendered.

emotional distress. *Id.* at § 46(1). When, however, the extreme and outrageous conduct is directed at a third party with the intent to cause the plaintiff emotional distress, recovery is more limited. As pertinent here, the *Restatement* permits recovery in that circumstance only when the injurious conduct was directed at a plaintiff's immediate family member and the plaintiff was physically "present" at the time of the conduct. *Id.* at § 46(2)(a).[4]

Plaintiff acknowledges that his claim is accurately characterized as a "third party" claim within the meaning of section 46(2). That is, the gravamen of plaintiff's IIED claim is that the allegedly injurious acts (defendants' diagnosis and treatment of Lee Ann) was not conduct directed at plaintiff. Rather, plaintiff alleges severe emotional distress as a collateral consequence of the counseling relationship between Lee Ann and defendants. Much of the parties' arguments therefore focus on whether Oregon should embrace the *Restatement*'s "presence" requirement for third-party IIED claims. More fundamentally, however, the question is whether Oregon should adopt third-party liability at all in this circumstance. As we describe below, Oregon has not yet embraced section 46 of the *Restatement* generally or its provisions for third-party claims.

Our analysis is aided by first describing the historical development of the tort of IIED in this state in the context of an ordinary two-party claim. Oregon adopted that tort, which was initially referred to as "outrageous conduct," in *Pakos v. Clark*, 253 Or 113, 453 P2d 682 (1969). In doing so, the Supreme Court acknowledged the elements of IIED as outlined in section 46 of the *Restatement* without expressly

---

[4] The full text of section 46 provides:

"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

"(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

"(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

"(b) to any other person who is present at the time, if such distress results in bodily harm."

adopting those elements. *Id.* at 122-26; *see also Rockhill v. Pollard*, 259 Or 54, 55, 485 P2d 28 (1971). In subsequent case law, the Supreme Court has suggested it has adopted the basic elements of the tort as outlined in section 46, but has not adopted section 46 *in toto* as Oregon law. *McGanty v. Staudenraus*, 321 Or 532, 545-46, 901 P2d 841 (1995) (court previously has adopted elements of tort of IIED as outlined in the *Restatement*, including its definition of intent); *Hammond*, 312 Or at 25 n 6 (court has not previously adopted *Restatement* section 46 in full as Oregon law). Thus, the Supreme Court's jurisprudence provides no guidance on whether or when an IIED claim may be brought based on conduct directed to third parties.

Nor has this court specifically identified the limits of a "third-party" claim for IIED or even expressly recognized such a claim, despite the parties' assumption that we have. Plaintiff relies on *Spiess* as holding that an IIED claim may be brought by someone outside of, but allegedly affected by, a professional relationship. In *Spiess*, the plaintiff brought an IIED claim against a psychiatrist with whom the plaintiff's wife had an affair during the course of her treatment for marital counseling. The only issue presented to us in that case, and the only issue that we addressed, was whether the claim was barred because it was, in effect, the equivalent of the abolished torts of criminal conversation and alienation of affections. *Spiess*, 89 Or App at 292-93. Because the interests at stake distinguished the IIED claim from those abolished causes of action, we concluded that the IIED claim was erroneously dismissed for failure to state a claim. Our opinion in *Spiess* did not explicitly address the question of third-party IIED claims, and the parties did not present that question to us. Nor did the opinion purport to adopt section 46(2) of the *Restatement.* Given that posture, we decline to treat *Spiess* as authoritatively deciding the predicate issue of whether Oregon law recognizes liability for "third-party" IIED claims.[5]

---

[5] We note, in addition, that *Spiess* also involved conduct that was arguably directed to the husband as well as to the wife (*i.e.*, the psychiatrist followed the husband and wife to California and Hawaii on family vacations ). 89 Or App at 291.

Defendants approach the issue somewhat differently. They assume that we have adopted the *Restatement*'s position on third-party IIED claims, together with the "presence" requirement in section 46(2). For that proposition, they rely on *State v. Carrillo*, 125 Or App 52, 865 P2d 379 (1993). We disagree that *Carrillo* supports that assumption.

In *Carrillo*, the state sought restitution from the defendant for counseling expenses incurred by the victim's mother as a result of the defendant's crime. Under the applicable criminal statutes, restitution could be ordered only if the state could present a theory on which the mother could recover those expenses in a civil action. *Id.* at 54-55. The state argued that the mother could have brought a claim for IIED. In rejecting that argument, we noted first that the state had incorrectly assumed that Oregon permits recovery of damages from a defendant for severe emotional distress resulting from conduct directed at a third person. *Id.* at 55. We characterized the issue as unresolved under Oregon law, suggesting that the state could not prevail in a criminal case where there was no *existing* civil action. *Id.* Our further acknowledgment of the presence requirement of section 46(2) was theoretical only: "Even assuming that such recovery is available [in third-party claims], the state's argument fails, because there is no evidence in this record that the mother was present at the time of defendant's criminal conduct." *Id.* at 56. We therefore decline to read *Carrillo* as formally adopting that section of the *Restatement* on third-party IIED claims, or as authoritatively endorsing its requirement of "presence" where an immediate family member incurs only emotional distress unaccompanied by any physical injury. The more important point to be taken from *Carrillo*'s discussion is that criminal restitution is not available on the basis of a previously unrecognized theory of civil tort liability, and a third-party IIED claim is such a theory.

To summarize, Oregon jurisprudence has not authoritatively considered and adopted the *Restatement*'s section 46, together with subsection two's recognition of potential liability based on conduct directed at third parties and the limitations that the *Restatement* places on such liability. The cases discussed above do not necessarily preclude a "third-party" claim for IIED, but neither do they expressly

recognize such a claim. The issue remains, as we suggested in *Carillo,* unresolved. *See also Checkley v. Boyd,* 170 Or App 721, 733-34, 14 P3d 81 (2000), *rev den* 322 Or 239 (2001) (so observing).

■ We conclude, however, that this is not the case in which to resolve the broad question of whether "third-party" claims for IIED should be recognized at all in Oregon, and if so, on what terms. As the Supreme Court observed years ago in the related area of third-party claims for negligently inflicted emotional distress, there are few guideposts for the analysis of whether such a new tort should be recognized. *See Norwest,* 293 Or at 558-67.[6] Rather than embark on that uncertain inquiry, this case can be resolved on more familiar ground—*i.e.,* whether the complaint adequately stated a claim for IIED. Defendants raise that issue in a cross-assignment of error challenging the trial court's denial of their motion to dismiss the IIED claims. In particular, defendants renew their argument on appeal that the facts alleged in the complaint, together with all inferences favorable to plaintiff that they support, fail as a matter of law to allege conduct that is actionable in an IIED claim. For the reasons we discuss below, we agree that denial of the motion was error and affirm on that alternative ground.

■ To state a claim for intentional infliction of emotional distress, a plaintiff must allege that:

> " '(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct.' "

*McGanty,* 321 Or at 543 (quoting *Sheets v. Knight,* 308 Or 220, 236, 779 P2d 1000 (1989)). Determining whether the alleged conduct is an extraordinary transgression of the bounds of socially tolerable conduct is initially a question of law. *Harris v. Pameco Corp.,* 170 Or App 164, 171, 12 P3d 524 (2000).

---

[6] *See also Cain v. Rijken,* 300 Or 706, 716-17, 717 P2d 140 (1986) (declining to decide whether there is a common-law action for a third party physically injured by the acts of a psychiatrist's patient given the "controversial thicket" of cases in the area, combined with the existence of a statutory basis for decision).

 Whether the conduct alleged is sufficiently extreme or outrageous to be actionable is a fact-specific inquiry, one to be made on a case-by-case basis considering the totality of the circumstances. *Lathrope-Olson v. Dept. of Transportation*, 128 Or App 405, 408, 876 P2d 345 (1994). In *Rosenthal v. Erven*, 172 Or App 20, 23-24, 17 P3d 126 (2001), we described some of the factors potentially relevant to that inquiry:

> "The *Restatement (Second) of Torts* and treatises use terms such as 'outrageous' and 'extreme' to describe conduct actionable as IIED, but the facts of decided cases convey more than adjectives do to guide our analysis of this element. Various factors bear upon the offensiveness of the conduct, including whether a special relationship exists between the defendant and the plaintiff, such as that of physician-patient, counselor-client, or common carrier-passenger. *Williams v. Tri-Met*, 153 Or App 686, 689-90, 958 P2d 202 (1998); *Erickson v. Christenson*, 99 Or App 104, 107, 781 P2d 383, *rev dismissed* 311 Or 266, 817 P2d 758 (1991). Other factors include whether the conduct was undertaken for an ulterior purpose or to take advantage of an unusually vulnerable individual. *See Checkley v. Boyd*, 170 Or App 721, 14 P3d 81 (2000). The setting in which the allegedly outrageous conduct occurs—for example, in a public venue or within the employment context—also can bear on the degree of offensiveness of the conduct. *See, e.g., Hall*, 292 Or [131,] 137[, 637 P2d 126 (1981)]; *Trout v. Umatilla Co. School Dist.*, 77 Or App 95, 102, 712 P2d 814 (1985)."

The relationship between the parties has particular bearing on potential characterization of the conduct as extreme or outrageous. That is so because "a defendant's position or role *vis-à-vis* a plaintiff may be one that 'imposes on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters among strangers.'" *Williams*, 153 Or App at 689-90 (quoting *McGanty*, 321 Or at 547-48). In fact, the lack of such a relationship generally defeats a conclusion that the conduct is actionable through an IIED claim. As this court observed some years back, "[a] 'special relationship' between the parties has played a role in every case in this state involving [a successful claim of IIED]." *Christofferson v. Church of Scientology*, 57 Or App 203, 209,

644 P2d 577, *rev den* 293 Or 456 (1982), *cert den* 459 US 1206 (1983). That observation appears to remain generally true.[7]

█ As we earlier discussed in analyzing the dismissal of plaintiff's negligence claims, plaintiff alleges no special relationship between himself and defendants. The only special relationship alleged here consists of the counseling relationship between Lee Ann and defendants. Rather than provide a basis for plaintiff to assert that defendants have a "greater obligation to refrain" from subjecting plaintiff to mental distress than would otherwise be true, that fact supports the conclusion that no such obligation exists. That is so because imposing heightened obligations on persons outside to the therapist-patient relationship actually poses a threat to that relationship. As one commentator observes, "[i]ssues of confidentiality, divided therapist loyalty, and patient autonomy are crucial in the context of the therapist-patient relationship."[8] To conclude that a therapist has a heightened duty to refrain from invading a nonpatient's emotional well-being would put therapists in the untenable position of potentially compromising their judgment, and necessarily their patient's interests, in order to safeguard the emotional well-being of persons outside the therapist-patient relationship. The problems of that approach were aptly expressed by the Illinois Supreme Court in *Doe v. McKay*, 183 Ill 2d 272, 315-16, 700 NE2d 1018 (1998):

---

[7] A considerable number of cases have been decided since we made that observation in *Christofferson*. Our review of the cases suggests that a special relationship has been alleged in almost all successfully pleaded claims. Although the cases are too numerous to cite, more recent cases in which a claim has been successfully pleaded or proved include *Babick v. Oregon Arena Corp.*, 333 Or 401, 40 P3d 1059 (2002) (employer/employee); *Williams*, 153 Or App 686 (plaintiff's status as disabled person; defendant's status as provider of public transportation); *Richer v. Poissen*, 137 Or App 157, 903 P2d 932 (1995) (landlord/tenant); *Whelan v. Albertson's, Inc.*, 129 Or App 501, 879 P2d 888 (1994) (employer/employee); *Spiess*, 89 Or App 289 (psychiatrist/patient); *Dalby v. Sisters of Providence*, 125 Or App 149, 865 P2d 391 (1993) (supervisor/employee); *Erickson*, 99 Or App 104 (pastor-therapist/parishner-patient); *McCool v. Hillhaven Corporation*, 97 Or App 536, 777 P2d 1013, *rev den* 308 Or 593 (1989) (pastor-therapist/parishner-patient). *Kraemer v. Harding*, 159 Or App 90, 976 P2d 1160 (1999) (IIED claim successfully brought by school bus driver against parents of children who rode on plaintiff's bus) may be the exception that proves the rule.

[8] James M. Berger, MD, *False Memory Syndrome and Therapist Liability to Third Parties For Emotional Distress Injuries Arising from Recovered Memory Therapy: a General Prohibition on Liability and a Limited Liability Exception*, 73 Temp L Rev 795, 816 (2000).

"Approval of the plaintiff's cause of action * * * would mean that therapists generally, as well as other types of counselors, could be subject to suit by any nonpatient third party who is adversely affected by the personal decisions perceived to be made by a patient in response to counseling. This result would, we believe, place therapists in a difficult position, requiring them to answer to competing demands and to divide their loyalty between sharply different interests. Concern about how a course of treatment might affect third parties could easily influence the way in which therapists treat their patients. Under a rule imposing a duty of care to third parties, therapists would feel compelled to consider the possible effects of treatment choices on third parties and would have an incentive to compromise their treatment because of the threatened liability. * * * This would exact an intolerably high price from the patient-therapist relationship and would be destructive of that relationship."[9]

Although the court in *Doe* made that observation in rejecting a negligent infliction of emotional distress claim, the same problems would arise in the context of an IIED claim. The intent element of the claim does not require a malicious motive or a purposeful design to inflict emotional distress on the plaintiff; it is satisfied if a defendant either "desires to inflict severe emotional distress, or knows that such distress is certain, or substantially certain, to result from his conduct." *McGanty*, 321 Or at 550 (quoting *Restatement (Second) of Torts* § 46 cmt *i* (1965)) (emphasis omitted). Such a standard would provide little or no impediment to an IIED claim in the context of a therapist-patient relationship. Severe distress to other family members is predictable and perhaps even inevitable when a therapist assists a patient in choosing, for example, to dissolve a marriage, to give a child up for adoption, to reveal another family member's prior sexual or physical abuse or other criminal conduct, or to make other life choices that deeply distress or offend family members (*e.g.*, marrying someone of a different religion or ethnicity, or living openly as a gay person). Put simply, in many

---

[9] The court in *Lindgren v. Moore*, 907 F Supp 1183, 1189 (ND Ill 1995), similarly observed that "doctors should be free to recommend a course of treatment and act on the patient's response to the recommendation free from the possibility that someone other than the patient might complain in the future."

therapy situations, significant and even severe distress to other family members can "go with the territory" if a patient is to deal successfully with the patient's own emotional well-being.[10]

A plaintiff's status as an outsider to the confidential and privileged therapist-patient relationship therefore is a significant factor in assessing whether conduct directed by the therapist to the patient exceeds the bounds of what is socially tolerable. Our society deems the therapist-patient relationship to be of a fiduciary nature and accords it confidential and privileged status.[11] Given that status, society inherently expects the therapist to make treatment choices based on the therapist's judgment as to what will best serve the patient and not to compromise that judgment based on the emotional reactions of persons outside the therapist-patient relationship. In other words, it is not an extraordinary transgression of the bounds of socially tolerable conduct for a therapist to let the patient's interests dictate the therapy choices, even when to do so disregards the psychic interests of nonparties to the relationship. Plaintiff's status as an outsider to defendants' therapist-patient relationship thus is a strong factor weighing against a conclusion that the conduct alleged does not cross the threshold of potential liability.

Nor can the conduct be characterized as outrageous from Lee Ann's vantage point, at least based on the allegations of the complaint. At a minimum, for a nonpatient to have an IIED claim based on a therapist's treatment of a patient, the conduct should be outrageous as to the patient. Here, however, nothing alleged permits a conclusion that the

---

[10] As one commentator—in discussing third-party professional malpractice claims turning on the foreseeability of such injuries to nonpatients—has put it, "[t]he numbers of potential cases boggle the mind." Cynthia Grant Bowman, *The Manipulation of Legal Remedies to Deter Suits by Survivors of Childhood Sexual Abuse*, 92 NW U L Rev 1481, 1488 (1998). The number seems only slightly less mind-boggling when the standard is knowledge of a substantial certainty rather than foreseeability.

[11] *See, e.g.*, OEC 504 (evidentiary privilege). *See generally Jaffee v. Redmond*, 518 US 1, 12-13, 116 S Ct 1923, 135 L Ed 2d 337 (1996) (recognizing federal privilege for confidential therapist-patient communications based, in part, on the fact that the relationship is protected in all 50 states and the District of Columbia); *State v. Miller*, 300 Or 203, 209, 709 P2d 225 (1985), *cert den* 475 US 1141 (1986) (therapist-patient privilege is widely recognized and confidentiality is of particular importance to the relationship).

conduct approaches that level of severity. According to the complaint, Lee Ann entered the therapist-patient relationship voluntarily after both she and plaintiff became convinced of the existence of a satanic cult, of their involvement in it, and of the validity of Lee Ann's multiple personality diagnosis and the treatment of it. Although the allegations of the complaint suggest that, at some point, plaintiff may have come to view defendants' treatment and counseling of Lee Ann as inappropriate, no allegation suggests that Lee Ann ever did so. The complaint neither alleges directly nor permits the inference that Lee Ann was in treatment involuntarily, that she was at any point dissatisfied with her therapy, or that the outcome (including the dissolution of her marriage) did not serve her perception of her own interests.

This case thus bears close resemblance to *Christofferson*. There, the plaintiff brought an IIED claim against a religious organization that engaged in certain therapeutic techniques grounded in its theology. The plaintiff took courses through the organization that involved the use of those therapeutic techniques. In her complaint, the plaintiff alleged: that the defendants engaged in a scheme to gain control of her mind and to force her into a life of service to their organization; that they intentionally alienated plaintiff from her family; that they intentionally impaired her ability to direct her life and make reasonable judgments; and that they coerced her into performing labor for the organization and to follow the organization's dictates under threat of retribution. 57 Or App at 212.

Despite those allegations, we concluded that the conduct was not actionable in an IIED claim. We focused particularly on the plaintiff's voluntary participation in the courses and our assessment that her allegations of "indoctrination" did not meaningfully distinguish her claim from the sort of indoctrination that commonly occurs in our society in the context of any number of organizations. Specifically, we observed:

"There is no evidence that plaintiff was threatened or forced to remain in Scientology. * * * Plaintiff became involved and maintained her involvement because she desired to do so. If misrepresentations were made regarding the benefits

or the nature of Scientology which gave rise to that desire, her remedy would be for fraud, not outrageous conduct.

"Plaintiff was recruited and indoctrinated into the Church of Scientology. That recruitment and indoctrination, as far as this record discloses, were not so very different than might be used by any number of organizations. She joined the group voluntarily, albeit, as she claims, on the basis of misrepresentations made to her. However, she continued to participate and maintained her involvement for whatever reason without actionable threats or coercion by defendants.

"* * * The most that can be said is that plaintiff was convinced by defendants to accept what they were teaching; unless the means involved more than persuasion, that is not outrageous. Whether or not we find any merit to defendants teachings, plaintiff apparently did find merit in them during the time she was associated with Scientology. The fact that she was later convinced of their invalidity does not make defendants' conduct outrageous post hoc."

*Id.* at 222-23.

Our analysis in *Christofferson* compels a similar conclusion here. As in *Christofferson,* Lee Ann's participation in her own therapy was purely voluntary; the most that can be said is that defendants reinforced Lee Ann's pre-existing belief that their form of therapy would assist her. Unlike *Christofferson,* however, nothing in the complaint suggests that Lee Ann became convinced after the fact that the therapy was not in her interests or that she was otherwise dissatisfied with it. Nor are the allegations as to defendants' conduct in this case as egregious as those in *Christofferson,* a fact that likewise detracts from characterizing the conduct as outrageous and extreme. In *Christofferson,* the defendants allegedly acted out of a deliberate scheme to control the plaintiff's mind, intentionally alienated the plaintiff from her family, and intentionally impaired the plaintiff's ability to make judgments and direct her life. Nothing of the sort appears in this complaint. To the contrary, rather than set forth any independent allegations as to the conduct that is the basis for

the IIED claims, those claims expressly incorporate the allegations of the negligence claims against defendants. Specifically, the claims for IIED allege that defendants were negligent in the diagnosis, care, and treatment of Lee Ann in various particulars; that, as a result of their negligent treatment and counseling, Lee Ann's psychological condition worsened and the family relationships became strained; and that Lee Ann's reaction to the counseling "result[ed] in divorce from [plaintiff] and [the] loss of [Lee Ann's] rights to custody of her minor children[,]" all of which caused plaintiff and the children to suffer severe emotional distress.

■ Although there is no requirement that the conduct that is the basis of an IIED claim be tortious, the purpose of the conduct and the means used to achieve it are a key focus of the action. *See Patton v. J.C. Penney Co.*, 301 Or 117, 123, 719 P2d 854 (1986). Conduct intentionally or deliberately engaged in—for example, with an ulterior motive, or for retribution, or for some other offensive purpose (such as to take advantage of a vulnerable victim)—is far more likely to meet the standard for outrageousness than conduct that is merely negligent. *Compare Babick v. Oregon Arena Corp.*, 333 Or 401, 40 P3d 1059 (2002) (employer exposed employees to imminent threat of physical harm by releasing a vengeful mob and contributed to threatening atmosphere by publicly rebuking employees on the scene), *Dalby v. Sisters of Providence*, 125 Or App 149, 865 P2d 391 (1993) (retaliatory motive contributed to outrageousness of conduct), *and Checkley*, 170 Or App 721 (ulterior purpose and vulnerable victim gave rise to actionable claim), *with Downs v. Waremart, Inc.*, 137 Or App 119, 139-41, 903 P2d 188 (1995) (falsity of charge of wrongdoing not actionable where falsity was not deliberate and no wrongful motive was involved). In fact, we have identified no Oregon case in which the conduct that was the basis for an IIED claim was alleged to have been merely negligent and nevertheless was determined to be actionable. If anything, the cases suggest that conduct that is negligent, mistaken, or otherwise remiss rather than deliberate, intentional, or engaged in by design will not support a claim for IIED. *See, e.g., Hammond*, 312 Or at 27-28 ("plaintiff has not shown that defendants' conduct was anything more than negligent" and it therefore could not reasonably be

found by a jury to be an extraordinary transgression of the bounds of socially tolerable conduct); *Hall v. May Dept. Stores Co.*, 292 Or 131, 135, 637 P2d 126 (1981) ("lack of foresight, indifference to possible distress, even gross negligence is not enough to support" an IIED theory of recovery); *Richardson v. Guardian Life Ins. Co.*, 161 Or App 615, 630, 984 P2d 917, *rev den* 329 Or 553 (1999) (mistaken conduct did not constitute intentional infliction of emotional distress).

The above considerations, in combination if not individually, defeat plaintiff's claims for IIED. In their totality, plaintiff's allegations are that he is outside the therapist-patient relationship between defendants and Lee Ann; that the diagnosis and care given within that confidential and privileged relationship was negligent; that defendant became severely distressed, in a way that was substantially certain to occur, as a result of Lee Ann's treatment; and that Lee Ann voluntarily participated in that therapy. Moreover, nothing in the complaint suggests that Lee Ann has ever been dissatisfied with it or its outcome. Quite simply, we do not agree that such allegations, when made by an outsider to the patient-therapist relationship, support a conclusion that the therapy directed to the patient is an "extraordinary transgression of the bounds of socially tolerable conduct." *Hall*, 292 Or at 135.

In sum, we conclude in this case that plaintiff's claims for professional malpractice or ordinary negligence failed to state a cause of action. With regard to any claims of professional malpractice, plaintiff failed to allege that he had any special relationship with defendants that would give rise to a professional duty on their part to foresee any risk of harm to him arising out of their professional conduct. Likewise, those claims are not sufficient to state a claim for ordinary negligence. Because plaintiff seeks redress for a purely psychic injury, he must allege a legal source of a duty on defendants' part to protect him from such harm beyond the common-law duty to exercise reasonable care to prevent foreseeable harm generally. The complaint contains no such allegations. The trial court therefore correctly granted defendant's motion to dismiss the negligence claims.

With regard to plaintiff's IIED claims, we affirm the trial court's judgment on the alternative ground that those claims should have been dismissed for failure to state a claim. In doing so, we do not resolve the question of whether third-party IIED claims generally should be acknowledged in Oregon, or the subsidiary question of whether, if such a claim is acknowledged, Oregon should adopt a "presence" requirement. Instead, we resolve this case on the narrower ground that the complaint did not plead sufficiently egregious conduct to state an IIED claim. In assessing the allegations in that regard, we consider the plaintiff's status as a person outside the alleged "special relationship" for its bearing on that issue. That fact, in combination with the other facts set forth in the complaint, leads us to conclude that, as alleged, defendants' conduct as a matter of law was not an extraordinary transgression of the bounds of socially tolerable conduct.

Affirmed.