Jeffrey **GIULIO**, individually; and Jeffrey Giulio, a conservator of the estate of T.G., a minor child, Plaintiff,

v.

BV **CENTERCAL, LLC**, a Delaware corporation; CenterCal Associates, LLC, a Delaware corporation; CenterCal Properties, LLC, a Delaware corporation; IPC International Corporation, an Illinois corporation, City of Tualatin, a municipal corporation; and Brad King, an individual, Defendants.

No. CV 09–481–AC.

United States District Court, D. Oregon, Portland Division.

Sept. 6, 2011.

---

Susan K. Lain, Hohbach Law Firm, LLC, Lake Oswego, OR, for Plaintiff.

Wm. Kelly Olson, Mitchell Lang & Smith, Portland, OR, for Defendant BV CenterCal, LLC.

Steven A. Kraemer, Mark C. Sherman, Hoffman Hart & Wagner, LLP, Portland, OR, for Defendant CenterCal Properties, LLC.

Lee S. Aronson, Schulte Anderson Downes Aronson Bittner, PC, Portland, OR, for Defendant IPC International Corporation.

David C. Lewis, Miller & Wagner, LLP, Portland, OR, for Defendants City of Tualatin, Oregon and Brad King.

## ORDER

HERNANDEZ, District Judge:

Magistrate Judge John V. Acosta issued a Findings and Recommendation (doc. # 99) on August 3, 2011, in which he recommends that I grant the motions for summary judgment (doc. # 29 and # 33) filed by CenterCal Properties, LLC and BV CenterCal, LLC, respectively. The Magistrate Judge also issued a Findings and Recommendation (doc. # 100) the same day, August 3, 2011, in which he recommends that I grant the motion for summary judgments (doc. # 40) filed by IPC International Corporation. The matter is now before me pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b).

■ Because no objections to the Magistrate Judge's Findings and Recommendations were timely filed, I am relieved of my obligation to review the record *de novo*. *United States v. Reyna–Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003); *see also United States v. Bernhardt*, 840 F.2d 1441, 1444 (9th Cir.1988) (*de novo* review required only for portions of Magistrate Judge's report to which objections have been made). Having reviewed the legal principles *de novo*, I find no error.

## CONCLUSION

The court ADOPTS the Magistrate Judge's Findings and Recommendations (doc. # 99 and # 100). Accordingly, Defendants' motions for summary judgment (doc. # 29, # 33, and # 40) are GRANTED.

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATION

ACOSTA, United States Magistrate Judge:

### Findings and Recommendation

This action revolves around a physical confrontation which occurred at Bridgeport Village, a shopping mall located in Tigard, Oregon. The plaintiffs, Jeffrey Giulio ("Jeffrey"), who appears in his individual capacity as well as in the capacity of conservator for his minor son, T.G. (collectively "Plaintiffs"), allege that defendants BV CenterCal, LLC ("BV CenterCal"), the owner of Bridgeport Village, and CenterCal Properties ("CenterCal"), the property management firm hired by BV CenterCal to manage Bridgeport Village (collectively "Defendants"), violated their civil rights by encouraging the City of Tualatin to arrest and charge them with criminal violations in retaliation for voicing concerns about customer safety at Bridgeport Village to a television reporter. Additionally, Plaintiffs assert claims against Defendants for negligence and intentional infliction of severe emotional distress. Defendants[1] seek summary judgment on all three claims.

---

1. CenterCal filed the initial motion for summary judgment and the majority of the evi-

The court finds that Defendants were not state actors under Section 1983, did not intentionally engage in socially intolerable conduct which resulted in emotional distress to Plaintiffs, and did not owe Plaintiffs a heightened duty of care. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' First Claim for Relief for constitutional violations brought under 42 U.S.C. § 1983, Second Claim for Relief for intentional infliction of emotional distress, and Fifth Claim for Relief for emotional damages based on negligent conduct.

### Preliminary Procedural Matters

At oral argument on Defendants' motions for summary judgment, Plaintiffs moved to reopen the depositions of Tualatin Police Chief Kent Barker and Captain Brad King to inquire into the reasons for Captain King's termination in July 2010, specifically with regard to Captain King's truthfulness, and for leave to supplement their opposition based on relevant evidence obtained in the depositions. This court granted the oral motion. Plaintiffs filed excerpts of the reopened depositions, as well as supplemental briefing based on those excerpts, in opposition to Defendants' motions for summary judgment. Defendants responded to the new evidence and arguments. All relevant arguments and admissible evidence, both initial and supplemental, have been considered by the court and are addressed in this Findings and Recommendation.

### I. Request to Strike Plaintiffs' Concise Statement

Local Rule 56–1(d) provides that "[u]nless approved by the Court in advance, neither the concise statement nor any response or reply thereto, may be longer than five (5) pages. Statements in excess of that amount may be stricken by the Court with direction to counsel to further condense the statement." Plaintiffs' response to CenterCal's concise statement of facts is six and a half pages in length and Plaintiffs did not seek leave of court to file the overlength statement. CenterCal asks the court to strike the portions of Plaintiffs' response that exceed the limit. The court notes that CenterCal also violated the rule by filing a six-page concise statement without prior court approval and that had Plaintiffs utilized the same size type as CenterCal, condensed the caption, and fully justified the concise statement, Plaintiffs' statement would not have been dramatically longer than CenterCal's. The court denies CenterCal's request and will consider Plaintiffs' response to CenterCal's concise statement of facts in its entirety.

### II. Deposition Excerpts

Plaintiffs have offered a number of deposition excerpts in their opposition and supplement materials. The excerpts are identified by Plaintiffs' counsel in her declarations as true and accurate copies of excerpts from the various depositions. The deposition excerpts attached to the Lain declarations do not contain any identifying features independent of this description.

The evidence presented in support of or in opposition to a motion for summary judgment must be based on personal knowledge, properly authenticated, and admissible under the Federal Rules of Evidence. FED.R.CIV.P. 56(c). "The requirement of authentication . . . as a condi-

---

dence supporting the motion. BV CenterCal subsequently filed a motion for summary judgment incorporating, and relying primarily on, CenterCal's motion pleadings and evidence. Because of the similarity of the issues, arguments, and evidence, the court will address both motions in this Findings and Recommendation.

tion precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED.R.EVID. 901(a). Evidence that is not properly authenticated will not be considered by the court when reviewing a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir.2002).

■ In *Orr*, the Ninth Circuit addressed the requirements for authenticating a deposition:

> A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent. See Fed.R.Evid. 901(b); Fed.R.Civ.P. 56(e) & 30(f)(1). Ordinarily, this would be accomplished by attaching the cover page of the deposition and the reporter's certification to every deposition extract submitted. It is insufficient for a party to submit, without more, an affidavit from her counsel identifying the names of the deponent, the reporter, and the action and stating that the deposition is a "true and correct copy." Such an affidavit lacks foundation even if the affiant-counsel were present at the deposition.

*Orr*, 285 F.3d at 774 (footnote and case citations omitted). The deposition excerpts offered by Plaintiffs are not accompanied by either a cover page or a reporter's certification and have no identifying information. It is impossible to tell from the excerpts who is being deposed, who is asking the questions, when the deposition occurred, or whether the deposition relates to this action. Plaintiffs' deposition excerpts are not properly authenticated under any reasonable interpretation of the rule. Defendants, however, have offered and authenticated excerpts from the depo-

sitions of T.G., Jeffrey, Keri Giulio, and Robert Dye, thereby providing the basis for their admissibility. In *Orr*, the Ninth Circuit held that:

> when a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties, subject to the right of any party to present evidence to the ultimate fact-finder disputing its authenticity.

*Orr*, 285 F.3d at 776. The deposition excerpts offered by Defendants include pages 19 and 66 of T.G.'s deposition, pages 14, 53, and 82 of Jeffrey's deposition, pages 4 and 29 of Keri's deposition, and page 20 of Dye's deposition, which are pages also offered by Plaintiffs. It is evident from comparing these pages that they contain identical content and are from the same deposition. Accordingly, these pages are properly authenticated through Defendants' submissions and will be considered by the court. However, the pages offered by Plaintiffs but not also offered by Defendants are not properly authenticated under *Orr*. Consistent with its practice in prior cases in which a party has failed to properly authenticate deposition excerpts, including *Chao v. Westside Drywall*, 709 F.Supp.2d 1037 (D.Or.2010), and *Kesey v. Francis*, No. CV. 06–540–AC, 2009 WL 909530 (D.Or. April 3, 2009), this courts strikes the pages the depositions excerpts offered only by Plaintiffs and will not consider them in this Findings and Recommendation.

### III. Summarized Testimony

■ Plaintiffs' counsel also summarizes testimony given by Phillip Orth, an IPC International Corp. ("IPC") security officer, and Ian Strombom, the IPC Sargent on duty the night of the incident, relating to IPC Officer Orth's experience as a security officer and his handling of T.G.'s initial

request for assistance. Plaintiffs' counsel represents that she was present for the deposition of both deponents and that she heard them testify to the events. Plaintiffs do not offer excerpts of either deposition.

Plaintiffs' counsel's statements are properly characterized as hearsay. Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R.EVID. 801(c). Plaintiffs' counsel is offering her summary of the deposition testimony of IPC Sargent Strombom and IPC Officer Orth as evidence to prove the truth of matter asserted in support of Plaintiffs' assertions of negligence against Defendants. In the absence of a procedural rule or statute, hearsay is inadmissible unless it is defined as nonhearsay under FED. R.EVID. 801(d) or falls within a hearsay exception under FED.R.EVID. 803, 803, or 807. There is no hearsay exception that applies to counsel's statements. Accordingly, the statements are inadmissible and will not be considered by the court.

### Factual Background

BV CenterCal, through its agent CenterCal, contracted with IPC[2] to provide security and public safety services at Bridgeport Village for a one-year term beginning on November 1, 2006. (Sherman Decl. Ex. 8.) The services covered by the contract included "providing a security presence, responding to calls for service, maintaining a safe environment, [and] preventing safety issues." (Harvey Dep. 58:15–21.) IPC developed an internal four-quad training program that it re-

quires all of its security officers to attend. (Harvey Dep. 12:18–25, 57:14–20). Additionally, IPC security officers are required to attend BPSST[3] training provided by the state prior to being hired to learn, in part, about the extent to which private security officers are able to physically intervene in altercations, which is limited by Oregon's BPSST written policies and procedures. (Harvey Dep. 61:1–13.) Center-Cal did not interfere with IPC's management of its employees. If CenterCal had an issue with IPC or its employees, they might raise the issue with IPC but would then expect that IPC would respond and handle it appropriately. (Dye Dep. 135:22–136:5.)

On the evening of Friday, April 11, 2008, T.G. attended a movie at Regal Cinemas in Bridgeport Village which concluded about 9:00 p.m. (T.G. Dep. 52:23–25.) After the movie,[4] T.G. approached IPC Officer Orth, informed him that a group of teens, including an individual named Roger, were trying to pick a fight with him, and asked for help. (T.G. Dep. 54:2–16; 66:3–11.) IPC Officer Orth told T.G. to ignore them and that he would be fine. (T.G. Dep. 54:16–17.) While T.G. walked away, IPC Officer Orth approached the group and asked them to keep some distance between themselves and T.G. (T.G. Dep. 56:18–22; Sherman Decl. Ex. 9.)

T.G. left the area and eventually ended up in Tutto Bene, a restaurant located in Bridgeport Village, where he called Jeffrey and asked him to come pick him up because he was being threatened. (Jeffrey Dep. 18:7–17.) The group of kids that had

---

2. IPC is a defendant in this action but is not a party to the motions addressed in this Findings and Recommendation.

3. The parties do not define BPSST, but the abbreviation likely refers to the state Board on Public Safety Standards and Training.

4. In his report, IPC Officer Orth indicated that T.G. first approached him about 7:30 p.m. (Sherman Decl. Ex. 9.)

been harassing him, including Roger, followed T.G. into the restaurant but then left when they heard that T.G. was on the phone with Jeffrey. (T.G. 27:25–26:4.) Shortly thereafter, Jeffrey arrived and gestured to T.G. to come with him from outside of the restaurant. (T.G. Dep. 33:1–11.) T.G. followed Jeffrey out of the restaurant and saw Jeffrey talking with a young Hispanic male whom he did not recognize and was not part of the group that had been harassing him. (T.G. Dep. 32:14–25.) T.G. heard Jeffrey ask the young man if he had been one of the kids picking on his son and informed Jeffrey that the individual was not part of the group that had been harassing him. (T.G. Dep. 33:12–19.) At that point, T.G. did not see any of the group that had previously been giving him a hard time. (T.G. Dep. 33:20–25.)

Keri Giulio, Jeffrey's wife and T.G.'s mother, approached the restaurant after dropping Jeffrey off and parking the car. (Keri Dep. 17:16–19.) She asked a number of kids who were standing by a bench about thirty feet away from T.G. if they were the kids who were harassing her son. (Keri Dep. 17:22–25; 18:10–19.) Keri ended up in a yelling match with one of the girls in the group. (Keri Dep. 29:7–12.) Again, T.G. did not recognize the girl as a member of the group that had been harassing him and were instructed by IPC Officer Orth to leave T.G. alone. (T.G. Dep. 66:23–67:2.)

IPC Officer Orth observed a verbal confrontation between Jeffrey and Keri, and a group of young Hispanics. (Sherman Decl. Ex. 9.) IPC Officer Orth indicated that he approached the commotion and tried to calm the participants but that Jeffrey and Keri told him not to say anything. (Sherman Decl. Ex. 9.) IPC Officer Orth then stepped away from the group

and called for backup. As the backup arrived, Keri and the girl began clawing and punching each other and ended up on the ground. (Sherman Decl. Ex.'s 9, 11.) While IPC Officer Pennington and IPC Sargent Strombom separated the individuals involved in the melee and attempted to keep them at the scene, IPC Officer Orth called 911 for police assistance. (Sherman Decl. Ex.'s 9, 10.) Officers Jayne, Asheim, Vandebrake, and Miller of the Tualatin Police Department arrived, took over the scene, and started interviewing the participants and witnesses, while the IPC officers maintained crowd control. (Sherman Decl. Ex.'s 9–11.)

The IPC officers issued 30–day no-trespass citations to each of the Giulios and to four of Hispanic youths involved in the incident. (Sherman Decl. Ex. 11.) Both Jeffrey and Keri advised officers that they wanted one or more of the kids involved in the confrontation arrested. (Jeffrey Dep. 3:18–21; Keri Dep. 30:10–13.)

In his report,[5] Officer Asheim recounted the statements of the seven individuals involved in the incident. (Sherman Decl. Ex. 12, at 6–9.) While it is disputed who initiated the first physical contact, there is no dispute that Jeffrey and Keri initiated the verbal contact with the group by asking who was responsible for harassing T.G., that the verbal contact escalated to yelling, swearing, and derogatory name calling, and that all seven individuals admitted to being involved in the physical altercation. (Sherman Decl. Ex. 12, at 6–9.)

Officer Asheim also summarized a statement that he took from a witness who flagged him down at the scene. (Sherman Decl. Ex. 12, at 8–9.) The witness indicated that she had gone to the same school as

5. This report was prepared on or about April 16, 2010.

T.G. but that she did not recognize anyone else involved in the incident. (Sherman Decl. Ex. 12, at 8.) She stated that she saw Jeffrey charge out of the restaurant, approach a group of Hispanics, and then yell at and push three young males in the group. (Sherman Decl. Ex. 12, at 9.) She also saw Keri approach a Hispanic female and then start yelling and pushing the girl. (Sherman Decl. Ex. 12, at 9.) She observed the fight which ensued and saw T.G. hit one of the females "in the face with a key that he was holding between his fingers." (Sherman Decl. Ex. 12, at 9.) T.G. recognized the witness, identifying her as a classmate and friend, and was aware that she had told officers that she saw him hit one of the girls with a ring of keys. (T.G. Dep. 19:1–19.) Officer Asheim noted elsewhere in his report that T.G. asked him if he would get in trouble for "using a key to hit [a girl] while she was fighting his mom." (Sherman Decl. Ex. 12, at 9.)

At that time, Officer Asheim believed that all of the individuals involved in the incident were engaged in mutual combat. (Sherman Decl. Ex. 12, at 10.) He, or one of the other officers, advised all involved that he hoped the security video, which would be available the following week, would clarify things and that if the investigation revealed probable cause that a crime had been committed, arrests would be made. (Sherman Decl. Ex. 12, at 10.) Officer Vandebrake retrieved the security video on Monday, April 14, 2008. (Sherman Decl. Ex. 12, at 10.) Unfortunately, the video was of poor quality, showed only a number of still and short video sequences of a large crowd in the area, and was not considered significant evidence for the investigation. (Sherman Decl. Ex. 12, at 10.)

After reviewing the reports and photographs from the incident, Captain King brought the incident to the attention of Chief Barker and Tualatin Police Captain Larry Braaksma at the regular Monday command staff meeting on April 14, 2008. (King Dep. Vol. I, Jan. 29, 2010 ("First King Dep.") 51:2–4.) Captain King remembered that "[w]e were all concerned that no enforcement action had been taken that night, given the fact that this took place in a crowded area of Bridgeport Village and that there were so many injured people depicted in the photographs." (First King Dep. 51:10–15.) Both Chief Barker and Captain King felt that, in this instance, it was best to take enforcement action if the officers could establish probable cause that an individual had committed a crime. (First King Dep. 67:3–6.) Chief Barker directed Captain King to discuss the incident with the responding officers. (First King Dep. 64:5–13.)

On April 15, 2008, Robert Dye, who was CenterCal's regional manager in charge of overall property management, including security, for Bridgeport Village, emailed Captain King about the incident seeking additional information so that he could respond to the concerns voiced by his tenants after seeing a news report of the event on a local television station. (Dye Dep. 19:25–20:5; Sherman Decl. Ex. 13.) In the email, Dye questioned whether the "parents sought out this group of teens to confront them, and exacerbat[ed] the situation instead of simply picking up their son and leaving", and closed by stating that he needed to do "some damage control." (Sherman Decl. Ex. 13.) At his deposition, Dye explained that this question was based on an IPC officer's report that Jeffrey told the officer, with the use of certain expletives, to back off when he tried to intervene and break the confrontation up. (Dye Dep. 40:23–41:10.) In his response later that same morning, Captain King informed Dye that additional information would have to wait until the officers who worked the incident returned the

following evening but noted that "[i]t appears from what we have available now, that the parents were as physically and emotionally involved as anyone." (Sherman Decl. Ex. 14, at 1; First King Dep. 46:17–21.) Captain King recalls Dye stating that Bridgeport Village wanted to prosecute "everyone" involved in the incident and encouraging Captain King to take enforcement action. (First King Dep. 47:4–9.)

On April 16, 2008, when the officers involved all returned to work, Captain King met with them to discuss the incident and why no arrests had been made. (Sherman Decl. Ex. 12, at 10.) The officers explained that the different version of events provided by the individuals involved that night made it impossible to determine the primary aggressor. (Sherman Decl. Ex. 12, at 10.) Officer Asheim stated that he did not feel comfortable charging only one group when they both had been engaged in mutual combat and committed crimes against each other. (Sherman Decl. Ex. 12, at 10.) Captain King provided guidance on the difference between probable cause and proof beyond a reasonable doubt, and the things to be considered in determining whether probable cause exists. (First King Dep. 64:22–4.) Captain King encouraged the officers to use their discretion more, consider the impact of an incident on the community, act in the best interest of the cause of justice, and let the attorneys consider the possible defenses unless that defense is noted in the statute. (First King Dep. 65:8–19, 67:3–9.) Captain King then told Officer Asheim that if he had probable cause to charge any of the parties involved, he wanted him to do it. (Sherman Decl. Ex. 12, at 10.) The officers eventually determined that they did

have probable cause to charge everyone involved with at least one crime, ranging from "disorderly conduct to harassment to second degree assault to riot." (First King Dep. 69:10–14; Sherman Decl. Ex. 12, at 10.) While Captain King admits that he told the officers that he had received calls from the media, Bridgeport Village representatives, and the Giulios, he stated that these communications did not impact his decision to encourage the officers to reconsider their original decision not to charge anyone involved in the incident. (King Dep. Vol. II, Jan. 29, 2010 ("Second King Dep.") 77:20–78:1.) [6]

That evening, Officer Jayne contacted Keri, advised her of the decision to charge everyone with crimes, and asked if she, Jeffrey, and T.G. would come in to receive their citations. (Sherman Decl. Ex. 12, at 10.) Officer Asheim contacted the father of two of the juveniles and, when no one answered the phone, left a message with the same information Officer Jayne relayed to Keri. (Sherman Decl. Ex. 12, at 10.)

The Giulios arrived at the Tualatin police station later that evening. (Sherman Decl. Ex. 12, at 11.) Jeffrey and Keri were arrested, charged with Assault IV for injuries they caused, Harassment for unwanted physical conduct they engaged in, and Disorderly Conduct II for their participation in fighting and tumultuous behavior, and released. (Sherman Decl. Ex. 12, at 11.) They both were upset and indicated that they were the ones that were attacked. (Sherman Decl. Ex. 12, at 11.) Officer Asheim explained that they were arresting and charging all of the parties involved and that the Washington County District Attorney's Office would determine

---

**6.** Captain King retired from the Tualatin Police Department on July 30, 2010. (Lain

Decl. in Supp. of Supplement Resp. Ex. 4.)

the outcome of the charges. (Sherman Decl. Ex. 12, at 11.)

Officer Asheim contacted Washington County Juvenile authorities and advised them that he was going to arrest T.G. for Assault II and Unlawful Use of a Deadly Weapon for using a key as a weapon, and for Disorderly Conduct II for his participation in fighting and tumultuous behavior. (Sherman Decl. Ex. 12, at 11.) Washington County advised Officer Asheim that, based on the severity of the charges, they wanted T.G. to be detained and lodged at the Donald E. Long Juvenile Center. (Sherman Decl. Ex. 12, at 11.) Officer Asheim explained to Jeffrey and Keri that T.G.'s charges were more serious because of testimony, as well as the question from T.G., indicating that he used a key when fighting with another teen. (Sherman Decl. Ex. 12, at 11.) T.G. denied asking the question and indicated that he asked Asheim only if he would get in trouble for pushing one of the girls off his mom. (T.G. Dep. 42:14–15; Jeffrey Dep. 82:6–8, 14–19.) After allowing him to say goodbye to his parents, Officer Asheim transported T.G. to the Washington County Juvenile department without the use of handcuffs. (Sherman Decl. Ex. 12, at 11.) Officer Asheim's report notes that T.G. was polite and cooperative, and that T.G. indicated that he thought this was a good learning experience for him not to get into fights. (Sherman Decl. Ex. 12, at 11.)

Upon his return, Officer Asheim was able to contact the father of two of the other juveniles involved who had previously been called. (Sherman Decl. Ex. 12, at 12.) He told the father that both his daughter and son were being referred to Washington County Juvenile, that his daughter would be charged with Assault IV for injuries she caused, and that they would both be charged with Disorderly Conduct II for their participation in fighting and tumultuous behavior. (Sherman Decl. Ex. 12, at 12.) Officer Asheim made arrangements for the juveniles to appear at the Tualatin Police station the following day and advised that they would be cited and released. (Sherman Decl. Ex. 12, at 12.) Due to the late hour, Officer Asheim did not attempt to contact the parents of the remaining two juveniles he intended to charge with Disorderly Conduct II for engaging in fighting and tumultuous behavior during the incident, but he planned to do it the following day. (Sherman Decl. Ex. 12, at 12.)

On April 17, 2008, Dustin Staten, Deputy District Attorney for Washington County, dropped the charges against T.G., indicating that the district attorney's office would not prosecute based on evidence of self-defense and mutual combat. (Sherman Decl. Ex. 17.) Staten explained that:

charges will not be filed in the Juvenile Court because the State will be unable to prove the charges beyond a reasonable doubt. This is a case that involves a verbal and physical dispute at Bridgeport Village. There were many participants in the dispute and several witnesses. The participants and witnesses gave different accounts of what transpired. After your original investigation you determined that this was a mutual combat situation and that there was not enough evidence to charge anyone without more investigative leads. After the date of the incident you reviewed video footage and determined that the video footage did not provide any additional guidance as to what transpired and thus the footage was "not significant evidence for this investigation." You subsequently advised Captain King that it was impossible to determine if one party was the primary aggressor in the altercation. After reviewing your report the State will be unable to prove the charges be-

yond a reasonable doubt. The Youth in this case would be able to claim self-defense of others and the evidence in your report strongly suggests that the State would be unable to rebut that claim.

(Sherman Decl. Ex. 17.)

After receiving this report, Officer Asheim decided not to pursue the charges against the other individuals involved and did not officially charge any of the Hispanic youths involved in the altercation. (Lain Decl. in Supp. Pl.'s Resp.) ("First Lain Decl. Ex. 6.") Upon hearing that Captain King still wanted charges pressed against everyone, Officer Asheim authored a memorandum to Captain King explaining why he decided not to charge the Hispanic youths. (First Lain Decl. Ex. 6.) In the memo, Officer Asheim acknowledged the "pressure" Captain King was under regarding the outcome of the case and explained that he did pursue charges with everyone in accordance with Captain King's direction despite the fact that he had previously cleared it as mutual combat. (First Lain Decl. Ex. 6.) He understood that the expectations of the community necessitated special handling and that he had no problem doing that in light of what he knew at the time. (First Lain Decl. Ex. 6.) However, once the district attorney indicated that the state would not prosecute for any of the crimes, Officer Asheim was not comfortable pursuing charges against the other parties and felt that it would be unethical. (First Lain Decl. Ex. 6.) Officer Asheim agreed that "in the future should we get similar calls it will most likely be appropriate to charge those involved with at least Dis Con and that looking back on the event that could have been done that night." (First Lain Decl. Ex. 6.) In his deposition, Captain King indicated that he agreed with this decision and he noted that while the intent was to charge everyone who was involved,

"[i]t would not have made sense to charge the other people who would have been subject to the same decision." (First King Dep. 104:24–105:8.) In early May, 2008, the Washington County District Attorney's office dropped the charges against Jeffrey and Keri based on virtually identical reasons. (Sherman Reply Decl. Ex.'s D, E.)

With the exception of an incident in which a number of juveniles ran through the interior of Regal Cinemas creating a noise disturbance, Dye is not aware of any negative situations or altercations involving minors at Bridgeport Village predating this incident. (Dye Dep. 136:20–137:6.) Similarly, other than an incident involving firecrackers which occurred one week before the incident at hand, Harvey is not aware any other fighting or disorderly conduct at Bridgeport Village besides the Giulio incident. (Harvey Dep. 50:8–12, 81:2–4.) Jeffrey stated that he and his family visited Bridgeport Village regularly, "over a hundred times," and had never had any issues prior to this incident. (Jeffrey Dep. 17:–18:13, 59:20–60:4.) He also indicated that he is not aware of any other incidents at Bridgeport Village that would indicate it was an unsafe location. (Jeffrey Dep. 77:4–12.) Keri gave virtually identical testimony. (Keri Dep. 35:8–20.) Finally, Captain King is not aware of any fights occurring at Bridgeport Village. (Second King Dep. 71:17–20.)

### Legal Standard

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a) (2010). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.,* 343 F.3d 1107, 1112 (9th Cir.2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278, 1284 (9th Cir.1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens,* 533 F.2d 429, 432 (9th Cir.1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America,* 638 F.2d 136, 140 (9th Cir.1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED.R.CIV.P. 56(c) (2010). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore,

where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotations marks omitted).

*Discussion*

### I. First Claim for Relief–Violation of 42 U.S.C. § 1983

In their First Claim for Relief, Plaintiffs allege that Defendants conspired with Captain King and the City of Tualatin to violate their rights under the First, Fourth, Fifth, and Fourteenth Amendments, including the right to free speech and to be free from unlawful detention, unreasonable search and seizure, malicious prosecution, and intimidation and humiliation. As evidence of Defendants involvement in the conspiracy, Plaintiffs point to the relationship between Defendants and the Tualatin Police Department, the communications between Dye and Captain King regarding the incident, and the "pressure" that Dye put on Captain King regarding the outcome of the case. Defendants argue that, as private entities, they can not be held liable under Section 1983.

 42 U.S.C. § 1983 provides, in pertinent part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

To state a claim under § 1983, a plaintiff must allege that the defendant was acting under color of state law at the time the acts complained of were committed, that

the acts complained of resulted in the deprivation of a right, privilege, or immunity secured by the Constitution or laws of the United States, and that the plaintiff was damaged as a result. *Thornton v. City of St. Helens,* 425 F.3d 1158, 1163–64 (2005); *Azer v. Connell,* 306 F.3d 930, 935 (9th Cir.2002).

■ Private persons may act under color of state law if they "willfully participate in joint action with state officials to deprive others of constitutional rights." *United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1540 (9th Cir.1989). Accordingly, to support their claim for violations under Section 1983 against Defendants, Plaintiffs must present evidence that Defendants conspired, or acted in concert, with state officials, namely, the Tualatin Police, to deprive them of a federal right. *Kimes v. Stone,* 84 F.3d 1121, 1126 (9th Cir.1996).

■ Private parties are viewed as state actors under Section 1983 in only rare circumstances. When determining whether a private party acted under color of law, the courts must "start with the presumption that private conduct does not constitute governmental action." *Sutton v. Providence St. Joseph Medical Center,* 192 F.3d 826, 835 (9th Cir.1999). The plaintiff bears the burden of overcoming this presumption. *E.F.W. v. St. Stephen's Indian High School,* 264 F.3d 1297, 1305 (10th Cir.2001)("[I]t is the plaintiff's burden to plead, and ultimately establish, the existence of a 'real nexus' between the defendant's conduct and the defendant's 'badge' of state authority in order to demonstrate action was taken 'under color of state law.'") (citation omitted).

■ Historically, courts have applied four different tests when determining whether the conduct of a private party qualifies as state action: (1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus. *Sutton,* 192 F.3d at 836. However, the primary question under each test is whether the necessary "close nexus" between the state, the private entity, and the challenged conduct exists. *Id.* Plaintiffs concede that the public function test does not apply here but argue that the remaining three tests require the court to find the existence of a conspiracy between Defendants and the City of Tualatin to violate their constitutional rights.

### A. Government Compulsion or Coercion

■ The government compulsion or coercion test was created to hold the government liable for the conduct of a private party when the private party acted in accordance with a law or regulation. *Id.* at 836. For example, where a plaintiff is attempting to hold a city government liable for discrimination based on the refusal of a privately-owned restaurant to serve African–American customers in accordance with a city ordinance requiring separation of the races. *Peterson v. City of Greenville,* 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963). On the other hand, in cases in which a plaintiff is attempting to hold a private party liable for a violation of constitutional rights by the government under the compulsion test, the plaintiff must establish not only that the private party acted in accordance with a law or regulation but also the existence of some other nexus between the private entity and the government. *Id.* at 839, 841. Here, Plaintiffs have failed to allege, or prove, that Defendants acted in compliance with any state or city law or ordinance with regard to the incident. The evidence establishes that Defendants, through Dye, merely cultivated a good relationship with the Tualatin Police department by hosting members of the department for lunch a

few times a year. Dye later advised Captain King that Defendants wanted to prosecute the individuals involved in the incident. None of this was compelled by any law or ordinance. Therefore, the government compulsion test is not applicable.

### B. Joint Action

In the joint action test, the question before the court is whether "the state has so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity. This occurs when the state knowingly accepts the benefits derived from the unconstitutional behavior." *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir.2003) (citation omitted). Plaintiffs argue that the City of Tualatin and Defendants both benefitted from the unconstitutional conduct by silencing the Plaintiffs and preventing them from complaining any further about the incident.

The Ninth Circuit has "been careful to require a substantial degree of cooperation before imposing civil liability for actions by private individuals that impinge on civil rights." *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir.2002). *See also, Brunette v. Humane Soc. of Ventura Cty.*, 294 F.3d 1205, 1211 (9th Cir.2002)("A private party is liable under this theory, however, only if its particular actions are 'inextricably intertwined' with those of the government.") (citations omitted). "Merely complaining to the police does not convert a private party into a state actor." *Collins v. Womancare*, 878 F.2d 1145, 1155 (9th Cir.1989)(citing *Rivera v. Green*, 775 F.2d 1381, 1382–84 (9th Cir.1985)). *See also D'Agostino v. N.Y. State Liquor Auth.*, 913 F.Supp. 757, 770 (W.D.N.Y.1996)("[i]t is uniformly recognized ... that a private party does not conspire or joint act with a state actor simply by complaining to the police.") (citations omitted). On the other hand, the Ninth Circuit has held that where a private party repeatedly seeks police assistance with a "self-help" eviction in the absence of proper notice or a prior judicial hearing, the private party could be held liable for constitutional violations resulting from police actions: *Howerton v. Gabica*, 708 F.2d 380, 384 (9th Cir.1983). In so holding, the court specifically acknowledged that a single request for police assistance in peacekeeping functions may not be sufficient to support a 1983 action against the private party. *Id.*

Here, there is no evidence that Defendants engaged in a series of acts in concert with the Tualatin Police with the mutual intent of violating Plaintiffs' constitutional rights. The fact that Dye cultivated a relationship with the Tualatin Police department, including Captain King and Chief Barker, over a period of time by having lunch with them every two or three months is not evidence that Defendants substantially cooperated with the Tualatin police to violate Plaintiffs' constitutional rights on the occasion in question. Similarly, Dye's email to Captain King seeking information about the incident to allow him to do some "damage control" and his statement that he wanted everyone involved in the incident prosecuted is not the type of involvement required to hold a private actor liable as a conspirator under the joint action test.

### C. General Nexus

Finally, the more general nexus test "asks whether 'there is such a close nexus between the State and the challenged action that the seemingly private behavior may be fairly treated as that of the State itself.'" *Kirtley*, 326 F.3d at 1094–95 (*quoting Brentwood v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001)). The discussion of the joint action test is equally

applicable to the general nexus test. Dye's relationship with the Tualatin police and his request that the individuals involved in the incident be prosecuted does not create a sufficiently close nexus to treat Defendants as state actors.

### D. Causal Relationship

■ Even if the court were to find that Defendants conspired with the Tualatin police by fostering a relationship and requesting that Plaintiffs and others involved in the incident be prosecuted, there is no evidence that such request resulted in Plaintiffs' arrest. When a state actor engages in conduct which allegedly violates § 1983, a private individual acting in concert with the state actor will not be liable for the violation unless the private individual was the proximate cause of the violation. "[A]bsent some showing that a private party had some control over state officials' decision [to commit the challenged act], the private party did not proximately cause the injuries stemming from [the act]." *Franklin*, 312 F.3d at 446 (quoting *King v. Massarweh*, 782 F.2d 825, 829 (9th Cir.1986)). Or, as explained by the Ninth Circuit in *Phelps Dodge*, "[e]vidence that police failed to exercise independent judgment will support an inference of conspiracy with a private party." *Phelps Dodge*, 865 F.2d at 1541.

The testimony establishes that Dye asked Captain King to arrest everyone involved in the incident, not just the Giulios. Additionally, Captain King testified that he discussed the issue with his superior officers, including Chief Barker, and was directed by such officers to pursue prosecution of the parties involved before Captain King received the communication in which Dye encouraged the arrests. Finally, the record makes it clear that Captain King told Officer Asheim only that arrests should be made if probable cause

exists and that Officer Asheim made that determination on his own without knowledge of Dye's specific request. Accordingly, even if Defendants, through Dye, were engaged in a conspiracy to arrest the Giulios, there is no evidence that Dye's statements resulted in the arrest or any consequent damages.

■ Defendants were not state actors under the compulsion, joint action, or nexus test. Therefore, they are not liable for the alleged violation of Plaintiffs' constitutional rights under Section 1983. In the alternative, even if this court were to find that Defendants conspired with Tualatin police to violate Plaintiffs' constitutional rights, there is no evidence that Defendants' participation in the conspiracy was the proximate cause of such violations. Plaintiffs have failed to support their claim against Defendants for constitutional violations under Section 1983. Defendants' motion for summary judgment on Plaintiffs' First Claim for Relief should be granted.

### II. Second Claim for Relief—Intentional Infliction of Severe Emotional Distress

■ Under Oregon law, a claim for intentional infliction of emotional distress only lies where the defendant intended to inflict severe emotional distress on the plaintiff, the defendant's acts were the cause of severe emotional distress, and the defendant's acts were an "extraordinary transgression of the bounds of socially tolerable conduct." *Madani v. Kendall Ford, Inc.*, 312 Or. 198, 203, 818 P.2d 930 (1991), *abrogated on other grounds by McGanty v. Staudenraus*, 321 Or. 532, 901 P.2d 841 (1995)(*citing Sheets v. Knight*, 308 Or. 220, 236, 779 P.2d 1000 (1989)). It is the defendant's acts, rather than their motives, that must be outrageous. *Id.* at 204, 818 P.2d 930.

█ The Oregon courts have limited "intent" to include only those situations where the defendant " 'desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct.' " *McGanty v. Staudenraus*, 321 Or. 532, 550, 901 P.2d 841 (1995)(quoting Restatement (Second) of Torts, § 46, comment i (1965)). The conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Christofferson v. Church of Scientology of Portland*, 57 Or.App. 203, 211, 644 P.2d 577 (1982) (quoting Restatement (Second) on Torts, § 46, comment d (1965)).

█ The determination of whether the alleged conduct is an extraordinary transgression of the bounds of socially tolerable conduct is initially a question of law for the courts. *Delaney v. Clifton*, 180 Or.App. 119, 129, 41 P.3d 1099 (2002). "Whether the conduct alleged is sufficiently extreme or outrageous to be actionable is a fact-specific inquiry, one to be made on a case-by-case basis considering the totality of the circumstances." *Id.* at 130, 41 P.3d 1099. "Socially intolerable conduct is conduct that is 'outrageous in the extreme.' " *Watte v. Edgar Maeyens, Jr., M.D., P.C.*, 112 Or.App. 234, 239, 828 P.2d 479 (1992)(quoting *Patton v. J.C. Penney Co.*, 301 Or. 117, 124, 719 P.2d 854 (1986)). Racial and ethnic slurs can be socially intolerable. *Lathrope–Olson v. Dept. of Transp.*, 128 Or.App. 405, 408, 876 P.2d 345 (1994). Likewise, language used to sexually harass has also been determined to be socially intolerable. *Id.* However, "[c]onduct that is merely 'rude, boorish, tyrannical, churlish and mean' does not satisfy that standard." *Watte*, 112 Or.App. at 239, 828 P.2d 479 (quoting *Patton v. J.C. Penney Co.*, 301 Or. at 124, 719 P.2d

854). In addition to the content of the statements, the court will also consider the context, the frequency of the statements, and the existence of any special relationship, including an employer and employee relationship, between the parties. *Harris v. Pameco Corp.*, 170 Or.App. 164, 171–2, 12 P.3d 524 (2000).

### A. Lack of Intent

█ Plaintiffs assert that Defendants acted in concert with the City of Tualatin and the Tualatin Police Department with the intent to scare Plaintiffs into keeping their mouths shut and prevent them from making any more public statements that reflected poorly on Defendants. In support of this assertion, Plaintiffs point to the email correspondence from Dye to Captain King in which Dye stated that Bridgeport Village wanted to prosecute "everyone" involved in the incident and encouraged Captain King to take enforcement action.

The evidence relied on by Plaintiffs does not support their assertion that Dye intended to scare them into keeping quiet. Dye indicated that he wanted "everyone" prosecuted, not just the Plaintiffs. There is no evidence that the others involved in the incident were making public statements or that Dye had any ulterior motive in asking that they be prosecuted in addition to Plaintiffs. The email clearly establishes that Dye wanted all involved to be prosecuted so that he could do some "damage control" and assure the general public that physical altercations at Bridgeport Village would not be tolerated or handled lightly. Plaintiffs have failed to present evidence that Defendants acted with the intent to inflict severed emotional distress on Plaintiffs.

### B. Lack of Socially Intolerable Conduct

█ Plaintiffs are also unable to establish that Defendants' actions were socially

intolerable. Here, Dye merely requested that all individuals involved in a physical confrontation at Bridgeport Village be prosecuted. This is not conduct that is "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." If asking police officers to prosecute individuals engaged in questionably illegal conduct was utterly intolerable conduct, every report or complaint of such conduct would support a claim for intentional infliction of emotional distress, an outcome clearly not supported by federal or state case law.

Relevant to the question of whether specific conduct qualifies as socially intolerable is the context, or setting, in which the conduct occurs, such as whether it occurred in a public context. *House v. Hicks,* 218 Or.App. 348, 360, 179 P.3d 730 (2008)(the private and indirect character of a report of wrongdoing to a police officer makes it less likely to be classified as outrageous). The fact that the request for prosecution was made to Captain King through email and not in the presence of Plaintiffs further supports a finding that the conduct was not socially intolerable. Most of the cases in which courts have found that the socially intolerable conduct occurred in the presence of, and was directed at, the plaintiff. *See, e.g., Hall v. May Dept. Stores Co.,* 292 Or. 131, 637 P.2d 126 (1982) *abrogated on other grounds by McGanty v. Staudenraus,* 321 Or. 532, 901 P.2d 841 (1995)(store manager interrogated employee accused of stealing from her cash register); *Rockhill v. Pollard,* 259 Or. 54, 485 P.2d 28 (1971)(doctor refused to treat two adults and an infant injured in a car accident, telling them they were all okay and forcing them to wait outside in sub-freezing temperatures for a ride to an emergency room); *Harris v. Pameco Corp.,* 170 Or.App. 164, 12 P.3d 524 (2000)(sexually charged comments and conduct by a male supervisor directed at a male employee); *Whelan v. Albertson's Inc.,* 129 Or.App. 501, 879 P.2d 888 (1994)(sexual comments made by supervisor were directed at employee and made in presence of other employees and customers); *Lathrope–Olson v. Oregon Dept. of Transp.,* 128 Or.App. 405, 876 P.2d 345 (1994)(overtly racist and sexual comments and other acts of psychological and physical intimidation by a supervisor and co-workers directed at a female employee).

Another common thread in successful claims for intentional infliction of emotional distress is the existence of a special relationship between the parties creating a heightened duty of care. An Oregon appellate court recently acknowledged that, historically, the existence of a special relationship was a defining factor in every successful claim of intentional infliction of emotional distress in this state, a fact which remains generally true even in recent cases. *House,* 218 Or.App. at 360, 179 P.3d 730 (citations omitted). The court specifically noted that "courts are more likely to categorize conduct as outrageous when it is undertaken by the dominant party in a legal relationship." *Id.* at 364, 179 P.3d 730. The types of relationships that have been held to support a claim for intentional infliction of emotional distress are those that "impose on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arms-length encounters among strangers" such as "employer-employee, physician-patient, counselor-client, landlord-tenant, debtor-creditor, or government officer-citizen." *Id.* at 360, 179 P.3d 730.

Plaintiffs argue that because Defendants held Bridgeport Village out as a safe place and induced families and youth to visit Bridgeport Village by making the mall available after hours and providing uni-

formed officers, they created a special relationship with all who visited Bridgeport Village. Plaintiffs have failed to offer, and the court is unaware of, any cases in which the Oregon courts have held that the owner or manager of property open for use by the public qualifies as the dominant party in a legal relationship with every citizen who utilizes the property. This type of relationship is more akin to an arms-length encounter with strangers then the more intentional and personal relationships found by the court to support an intentional infliction of emotional distress claim.

The last factor identified by the Oregon appellate court in *House* was "whether the conduct was undertaken with an ulterior motive or to take advantage of an unusually vulnerable individual." *Id.* (*citing Checkley v. Boyd*, 170 Or.App. 721, 727, n. 4, 14 P.3d 81 (2000)). As noted above, despite Plaintiffs' assertions that Defendants were acting with the purpose of silencing Plaintiffs, the evidence is clear that Dye wished to prosecute all of the participants in the physical altercation for "damage control" and to assure the public that Bridgeport Village was a safe place. There is no evidence of an ulterior motivation to harm Plaintiffs specifically. Additionally, there is no evidence that any of the Plaintiffs were unusually vulnerable in this instance.

### C. Lack of Causal Relationship

Finally, the conduct of Defendants was not a cause of Plaintiffs' emotional distress. As discussed above, the decision to arrest Plaintiffs was made independently by Tualatin police officers either before Dye requested that the individuals involved in the incident be prosecuted or without the knowledge of such request. Similarly, the decision to detain T.G. was made by Washington County Juvenile authorities without any input from Defendants or knowledge of Dye's request.

Plaintiffs have failed to establish that Defendants acted with the intent to inflict emotional harm on Plaintiffs, that Defendants' actions were socially intolerable or outrageous in the extreme, or that Defendants' conduct resulted in Plaintiffs' arrest or T.G.'s detention. Plaintiffs are unable to support their claim for intentional infliction of emotional distress.

### III. Fifth Claim for Relief–Negligence

In support of their claim for negligence, Plaintiffs allege that Defendants "owed plaintiffs a duty to intervene and to prevent the application of illegal use of force, resulting in injuries and damages to plaintiff[s] as alleged herein" and that Defendants specifically breached this duty by failing to:

(a) Provide sufficient and qualified employees available to maintain order on the premises of Bridgeport Village;

(b) Properly safeguard plaintiffs from injury;

(c) Properly train security personnel;

(d) Ensure a safe environment within their facility, Bridgeport Village; and

(e) Prohibit the group that attacked plaintiffs from remaining in Bridgeport Village after becoming aware of their disorderly and violent propensity.

(Compl. ¶¶ 55, 56.) Plaintiffs further allege that Defendants' negligence resulted in damages "in the form of severe emotional distress, anxiety, nervousness, humiliation, embarrassment, fright, and stress." (Compl. ¶¶ 57, 58.) Plaintiffs do not allege, and there is no dispute, that either Jeffrey or T.G. suffered physical injuries in the altercation.

■ Defendants argue they are entitled to summary judgment on Plaintiffs' negligence claim because, under Oregon law, absent some physical injury or impact, mental distress damages are not recoverable for solely negligent conduct. Plaintiffs do not address this argument in their opposition materials. In any case, it is clear under Oregon law that the absence of physical injury defeats Plaintiffs' negligence claim as a matter of law.

The Oregon Court of Appeals summarized the law relating to the recovery of emotional distress damages in *Bennett v. Baugh,* 154 Or.App. 397, 405, 961 P.2d 883 (1998), *rev'd on other grounds* 329 Or. 282, 985 P.2d 1282 (1999), as follows:

> The general rule in Oregon is that a person cannot recover for emotional distress in the absence of a physical injury. *Hammond v. Central Lane Communications Center,* 312 Or. 17, 22–23, 816 P.2d 593 (1991). Physical injury is not required, however, in three exceptional circumstances: (1) there is a specific intent to inflict emotional distress; (2) there is intentional misconduct by a person in a position of responsibility and with knowledge that is would cause "grave distress;" or (3) there is conduct that, even if negligent, infringes upon a "legally protected interest apart from causing the claimed distress." *Id.* See generally *Curtis v. MRI Imaging Services II,* 148 Or.App. 607, 614, 941 P.2d 602 (1997) *aff'd. on other grounds,* 327 Or. 9, 956 P.2d 960 (1998). As to the third exception, "the critical inquiry becomes whether the kind of interest invaded is of sufficient importance as a matter of policy to merit protection from emotional impact." *Hilt v. Bernstein,* 75 Or.App. 502, 515, 707 P.2d 88 (1985)(*rev. den.* 300 Or. 545 [715 P.2d 92] (1986)).

Plaintiffs do not allege that Defendants or IPC engaged in intentional conduct. Therefore, the only possible exception is for negligent conduct that infringes on a legally protected interest of sufficient importance to merit protection from emotional impact.

Because Plaintiffs have not responded to this argument in any way, the court is left to speculate about their argument. Based on these facts, the only argument that could reasonably be asserted by Plaintiffs is that the relationship they had with Defendants through IPC created a legally protected interest to be free from harassment from third parties. This argument would be without merit.

■ To prove a claim for solely emotional distress damages based on negligent behavior in Oregon, a plaintiff must first prove the existence of a "legally protected interest" which "refers to an independent basis of liability separate from the general duty to avoid foreseeable risk of harm." *Phillips v. Lincoln County School Dist.,* 161 Or.App. 429, 433, 984 P.2d 947 (1999). Oregon courts have found that an independent basis of liability exists based on the unique relationship between the parties and the heightened duty to avoid harm resulting from that relationship. Based on the relevant case law, it is evident that the salient inquiry is whether the defendant assumed a specific duty toward the plaintiff that is unique and distinguishable from the duty owed the public in general and that, as a result, has placed the plaintiff in a position of reliance on the defendant. In other words, the court must consider whether the plaintiff has sufficiently relinquished responsibility and control to a defendant in a specific circumstance to afford the plaintiff the right to rely upon the defendant to achieve a desired outcome or solution and authorized the defendant to exercise independent

judgment on their behalf. *Shin v. Sunriver Preparatory School, Inc.*, 199 Or.App. 352, 367–369, 111 P.3d 762 (2005), *citing Curtis*, 148 Or.App. at 619, 941 P.2d 602.

For example, the Oregon appellate court found that the relationship between a patient and medical professionals will often give rise to a legally protected interest in *Curtis*, 148 Or.App. at 618, 941 P.2d 602, and that a heightened duty of care resulted from the special relationship which existed between a student and a boarding school. *Shin*, 199 Or.App. at 367, 111 P.3d 762. Similarly, the Oregon Supreme Court held that a police officer has a specific duty to a citizen to enforce a restraining order in the manner prescribed by law based on the existence of a special duty imposed by statute. *Nearing v. Weaver*, 295 Or. 702, 707, 670 P.2d 137 (1983). Specifically relying on *Nearing*, this court has recently held that the general duty of a police officer to protect the community at large was not sufficient to create the special relationship necessary to support a claim for emotional distress damages based on allegations of negligent conduct. *Rubio v. Skelton*, No. CV 06–873–ST, 2008 WL 3853387, at *29 (D.Or. Aug. 14, 2008). Additionally, the Oregon courts have found that a special relationship did not exist between a bank and its customer in situations in which a bank's failure to adequately protect the customer's confidential information allowed a third party to misappropriate the confidential information resulting in collection actions against the customer, *Stevens v. First Interstate Bank of Cal.*, 167 Or.App. 280, 287, 999 P.2d 551 (2000), or when a bank's negligent denial of credit card charges for dinner at a restaurant resulted in public embarrassment to the customer. *Flowers v. Bank of Am. Nat'l Trust and Sav. Ass'n*, 67 Or. App. 791, 794, 679 P.2d 1385 (1983).

Here, Plaintiffs have not alleged, and there is no evidence, that Defendants, either individually or through IPC, or its security officers, owed a heightened duty of care to protect Jeffrey or T.G. as opposed to any other visitor of Bridgeport Village that evening. Plaintiffs did not relinquish any control to Defendants or IPC and, therefore, did not have the right to rely on Defendants or IPC to achieve a desired outcome. Plaintiffs are unable to support their negligence claim based on solely emotional distress damages and Defendants are entitled to summary judgment on the claim.

### Conclusion

Defendants' motions (# 29 and # 33) for summary judgment should be GRANTED.

### Scheduling Order

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due **August 18, 2011.** If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

## FINDINGS AND RECOMMENDATION

ACOSTA, United States Magistrate Judge:

### Findings and Recommendation

This action revolves around a physical confrontation which occurred at Bridgeport Village, a shopping mall located in Tigard, Oregon. The plaintiffs, Jeffrey Giulio ("Jeffrey"), who appears in his individual capacity as well as in the capacity of conservator for his minor son, T.G. (collectively "Plaintiffs"), allege that defendant

IPC International Corporation ("IPC"), the company hired to provide security services at Bridgeport Village, was negligent by failing to protect them from a group of teenagers on the evening of April 11, 2008. IPC filed a motion for summary judgment asserting that Plaintiffs failed to establish the required causal relationship between the injuries allegedly suffered by Jeffrey or T.G. and IPC's conduct, or lack thereof. IPC also argues that the injuries suffered were not foreseeable and the emotional injuries alleged will not support a negligence claim.[1] The court finds that under Oregon law, IPC did not owe Plaintiffs a heightened duty of care and that, as a result, Plaintiffs have failed to state a claim for emotional damages based on negligent conduct.

### Preliminary Procedural Matter

Plaintiffs have offered excerpts from T.G.'s deposition in their opposition materials. The excerpts are identified by Plaintiffs' counsel in her declaration as "a true and accurate copy of pages 60–63 from the transcript of the deposition of T.G., taken April 2, 2010." (Lain Decl. ¶ 4.) The four pages of deposition transcript attached to the Lain declaration do not contain any identifying features independent of this description.

The evidence presented in support of or in opposition to a motion for summary judgment must be based on personal knowledge, properly authenticated, and admissible under the Federal Rules of Evidence. FED.R.CIV.P. 56(c). "The requirement of authentication ... as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED.R.EVID. 901(a). Evidence that is not properly authenticated will not be considered by the court when reviewing a motion for summary judgment. *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir.2002).

In *Orr,* the Ninth Circuit addressed the requirements for authenticating a deposition:

A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent. See Fed.R.Evid. 901(b); Fed.R.Civ.P. 56(e) & 30(f)(1). Ordinarily, this would be accomplished by attaching the cover page of the deposition and the reporter's certification to every deposition extract submitted. It is insufficient for a party to submit, without more, an affidavit from her counsel identifying the names of the deponent, the reporter, and the action and stating that the deposition is a "true and correct copy." Such an affidavit lacks foundation even if the affiant-counsel were present at the deposition.

*Orr,* 285 F.3d at 774 (footnote and case citations omitted). The deposition excerpts offered by Plaintiffs are not accompanied by either a cover page or a reporter's certification and have no identifying information. It is impossible to tell from the excerpts who is being deposed, who is asking the questions, when the deposition occurred, or whether the deposition relates

---

1. IPC incorporates the arguments made by co-defendant CenterCal Properties, LLC, in its motion for summary judgment against Plaintiffs' negligence claim. The arguments relating to the issues of foreseeability and sufficiency of the injury are relevant to IPC and will be considered by the court. However, CenterCal Properties, LLC, also argued that they were not vicariously liable for the alleged negligent acts of IPC. The vicarious liability arguments are not relevant to IPC's liability and will not be addressed in this Findings and Recommendation.

to this action. Plaintiffs' deposition excerpts are not properly authenticated under any reasonable interpretation of the rule. IPC, however, has offered and authenticated excerpts from T.G.'s deposition, thereby providing the basis for its admissibility. In *Orr*, the Ninth Circuit held that:

> when a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties, subject to the right of any party to present evidence to the ultimate fact-finder disputing its authenticity.

*Orr*, 285 F.3d at 776. The deposition excerpts offered by IPC include pages 61–63 of T.G.'s deposition, three of the four pages offered by Plaintiffs. It is evident from comparing these pages that they contain identical content and are from the same deposition. Accordingly, pages 61–63 of T.G.'s deposition are properly authenticated through IPC's submissions and will be considered by the court. However, page 60 was not offered by IPC and is not properly authenticated under *Orr*. Consistent with its practice in prior cases in which a party has failed to properly authenticate deposition excerpts, including *Chao v. Westside Drywall*, 709 F.Supp.2d 1037 (D.Or.2010), and *Kesey v. Francis*, No. CV. 06–540–AC, 2009 WL 909530 (D.Or. April 3, 2009), this courts strikes page 60 of T.G.'s deposition offered by Plaintiffs and will not consider it in this Findings and Recommendation.

### Factual Background

On the evening of April 11, 2008, T.G. attended a movie at Regal Cinemas in Bridgeport Village which concluded about 9:00 p.m. During the movie, T.G. was harassed by Roger, a classmate of his with whom he had been involved in a physical altercation at school a few months before. (T.G. Dep. 9:1–9, 11:25–12:12.) Immedi-ately after the movie, Roger and a group of Hispanic boys surrounded T.G. outside the theater, called him names, and attempted to instigate a fight. (T.G. Dep. 14:13–15:11, 16:2–9.) T.G. walked away from the group, approached an IPC security guard, and asked for help. (T.G. Dep. 18:14–18, 23:16–20.) The security guard told T.G. to ignore them and then approached the group that had followed T.G. from the theater. (T.G. Dep. 23:21–25, 64:19–21.) It is unclear what the security guard said to the group but T.G. testified that they continued to follow him after the conversation. (T.G. Dep. 64:22–23.) T.G. walked away from the area after speaking with the security guard but gradually increased his speed to a run when he realized he was being followed by the group. (T.G. Dep. 61:12–14, 62:2–12.) T.G. eventually ended up in Tutto Bene, a restaurant located in Bridgeport Village, where he called Jeffrey and asked him to come pick him up. (T.G. Dep. 26:8–10, 54:20–23.) Roger and his group followed T.G. into the restaurant which prompted T.G. to call Jeffrey again and ask him to hurry up. (T.G. Dep. 26:6–13.) The group continued to harass T.G. in the restaurant until Jeffrey called him back to check on him, at which point they left the restaurant. (T.G. Dep. 26:14–20.)

T.G. left the restaurant a few minutes later when Jeffrey arrived. As T.G. walked out of the restaurant, he saw Jeffrey talking with a teenager. Jeffrey asked the young man if he had been one of the kids picking on his son and when T.G. informed him that he was not, Jeffrey apologized and patted him on the back. (Jeffrey Dep. 32:9–20.) At that point, T.G. did not see any of the group that had been harassing him in the restaurant. (T.G. Dep. 33:20–25.)

As Jeffrey and T.G. started walking, three more teenagers approached them

and threatened to "beat Jeffrey's ass." (Jeffrey Dep. 32:2–33:6.) Jeffrey told the kids they were a "bunch of punks" and to go home, and then laughed when one of the smaller teens said he was going to take Jeffrey down. (T.G. Dep. 35:11–17; Jeffrey Dep. 32:21–33:6, 38:14–18.) T.G. then noticed his mother, Keri Giulio, approach a group of about twenty to thirty Hispanic teenagers asking "Who is responsible?" and get into a verbal confrontation with a girl that T.G. did not recognize and had not seen before. (T.G. Dep. 35:19–36:14, 37:20–38:2, Jeffrey Dep. 39:19–25.) The verbal confrontation quickly led to a physical altercation with the girl hitting Keri, knocking her to the ground, and at least one teenage male attempting to tackle Jeffrey. (T.G. Dep. 37:13–19, 38:6–8, 39:5–12, Jeffrey Dep. 43:11–19.) T.G. attempted to help by pushing the most aggressive girl off Keri and stepping in front of a group that was approaching Jeffrey. (T.G. Dep. 39:11–25.) By this time, IPC security guards had arrived on the scene, were assisting Keri, and were attempting to keep the individuals involved on the scene. (T.G. Dep. 40:1–2, Jeffrey Dep. 44:21–45:10.) Tualatin police officers arrived on the scene shortly thereafter. There is no evidence that either Jeffrey or T.G. suffered physical injuries as a result of the incident.

### Legal Standard

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a) (2010). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir.2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir.1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir.1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir.1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. Fed.R.Civ.P. 56(c) (2010). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine

issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotations marks omitted).

### Discussion

Plaintiffs' sole claim against IPC is for negligence. Plaintiffs allege that IPC "owed plaintiffs a duty to intervene and to prevent the application of illegal use of force, resulting in injuries and damages to plaintiff[s] as alleged herein" and that IPC specifically breached this duty by failing to:

(a) Provide sufficient and qualified employees available to maintain order on the premises of Bridgeport Village;

(b) Properly safeguard plaintiffs from injury;

(c) Properly train security personnel;

(d) Ensure a safe environment within their facility, Bridgeport Village; and

(e) Prohibit the group that attacked plaintiffs from remaining in Bridgeport Village after becoming aware of their disorderly and violent propensity.

(Compl. ¶¶ 55, 56.) Plaintiffs further allege that IPC's negligence resulted in damages "in the form of severe emotional distress, anxiety, nervousness, humiliation, embarrassment, fright, and stress." (Compl. ¶¶ 57, 58.) Plaintiffs do not allege, and there is no dispute, that either Jeffrey or T.G. suffered physical injuries in the altercation.

IPC, through the incorporation of the arguments asserted by its co-defendant CenterCal Properties LLC, argues that it is entitled to summary judgment on Plaintiffs' negligence claim because, under Oregon law, absent some physical injury or impact, mental distress damages are not recoverable for solely negligent conduct.

Plaintiffs do not address this argument in its opposition to either IPC or CenterCal's motions for summary judgment. In any case, it is clear under Oregon law that the absence of physical injury defeats Plaintiffs' negligence claim as a matter of law.

The Oregon Court of Appeals summarized the law relating to the recovery of emotional distress damages in *Bennett v. Baugh,* 154 Or.App. 397, 405, 961 P.2d 883 (1998), *rev'd on other grounds* 329 Or. 282, 985 P.2d 1282 (1999), as follows:

The general rule in Oregon is that a person cannot recover for emotional distress in the absence of a physical injury. *Hammond v. Central Lane Communications Center,* 312 Or. 17, 22–23 [816 P.2d 593] (1991). Physical injury is not required, however, in three exceptional circumstances: (1) there is a specific intent to inflict emotional distress; (2) there is intentional misconduct by a person in a position of responsibility and with knowledge that is would cause "grave distress;" or (3) there is conduct that, even if negligent, infringes upon a "legally protected interest apart from causing the claimed distress." *Id.* See generally *Curtis v. MRI Imaging Services II,* 148 Or.App. 607, 614 [941 P.2d 602] (1997) *aff'd. on other grounds,* 327 Or. 9 [956 P.2d 960] (1998). As to the third exception, "the critical inquiry becomes whether the kind of interest invaded is of sufficient importance as a matter of policy to merit protection from emotional impact." *Hilt v. Bernstein,* 75 Or.App. 502, 515 [707 P.2d 88] (1985)(*rev. den.* 300 Or. 545 [715 P.2d 92] (1986)).

Plaintiffs do not allege that IPC engaged in intentional conduct. Therefore, the only possible exception is for negligent conduct that infringes on a legally protected interest of sufficient importance to merit protection from emotional impact.

Because Plaintiffs have not responded to this argument in any way, the court is left to speculate about their argument. Based on these facts, the only argument that could reasonably be asserted by Plaintiffs is that the relationship they had with the IPC security officers created a legally protected interest to be free from harassment from third parties. This argument would be without merit.

To prove a claim for solely emotional distress damages based on negligent behavior in Oregon, a plaintiff must first prove the existence of a "legally protected interest" which "refers to an independent basis of liability separate from the general duty to avoid foreseeable risk of harm." *Phillips v. Lincoln County School Dist.*, 161 Or.App. 429, 433, 984 P.2d 947 (1999). Oregon courts have found that an independent basis of liability exists based on the unique relationship between the parties and the heightened duty to avoid harm resulting from that relationship. Based on the relevant case law, it is evident that the salient inquiry is whether the defendant assumed a specific duty toward the plaintiff that is unique and distinguishable from the duty owed the public in general and that, as a result, has placed the plaintiff in a position of reliance on the defendant. In other words, the court must consider whether the plaintiff has sufficiently relinquished responsibility and control to a defendant in a specific circumstance to afford the plaintiff the right to rely upon the defendant to achieve a desired outcome or solution and authorized the defendant to exercise independent judgment on their behalf. *Shin v. Sunriver Preparatory School, Inc.*, 199 Or.App. 352, 367–369, 111 P.3d 762 (2005), citing *Curtis*, 148 Or.App. at 619, 941 P.2d 602.

For example, the Oregon appellate court found that the relationship between a patient and medical professionals will often give rise to a legally protected interest in *Curtis*, 148 Or.App. at 618, 941 P.2d 602, and that a heightened duty of care resulted from the special relationship which existed between a student and a boarding school. *Shin*, 199 Or.App. at 367, 111 P.3d 762. Similarly, the Oregon Supreme Court held that a police officer has a specific duty to a citizen to enforce a restraining order in the manner prescribed by law based on the existence of a special duty imposed by statute. *Nearing v. Weaver*, 295 Or. 702, 707, 670 P.2d 137 (1983). Specifically relying on *Nearing*, this court has recently held that the general duty of a police officer to protect the community at large was not sufficient to create the special relationship necessary to support a claim for emotional distress damages based on allegations of negligent conduct. *Rubio v. Skelton*, No. CV 06–873–ST, 2008 WL 3853387, at *29 (D.Or. Aug. 14, 2008). Additionally, the Oregon courts have found that a special relationship did not exist between a bank and its customer in situations in which a bank's failure to adequately protect the customer's confidential information allowed a third party to misappropriate the confidential information resulting in collection actions against the customer, *Stevens v. First Interstate Bank of Cal.*, 167 Or.App. 280, 287, 999 P.2d 551 (2000), or when a bank's negligent denial of credit card charges for dinner at a restaurant resulted in public embarrassment to the customer. *Flowers v. Bank of Am. Nat'l Trust and Sav. Ass'n*, 67 Or. App. 791, 794, 679 P.2d 1385 (1983).

Here, Plaintiffs have not alleged, and there is no evidence, that IPC, or its security guards, owed a heightened duty of care to protect Plaintiffs as opposed to any other visitor of Bridgeport Village that evening. Plaintiffs did not relinquish any control to IPC and, therefore, did not have the right to rely on IPC to achieve a desired outcome. Plaintiffs are unable to

support their negligence claim based on solely emotional distress damages and IPC is entitled to summary judgment on the claim.

*Conclusion*

IPC's motion (# 40) for summary judgment should be GRANTED.

*Scheduling Order*

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due **August 18, 2011.** If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.